CHARLES MARX, Executor of the Last Will and Testament of John Marx, Deceased,

*vs.*

## AUGUSTA MARX.

*Services to decedents: claims against estate; value; experts not necessary; quantum meruit. Evidence: one party being dead. Limitations.*

As between persons not members of the same family, the mere fact of rendering services useful to the party to whom they are rendered, furnishes *prima facie* evidence of their acceptance; and, in the absence of any proof to the contrary, there is an obligation to pay what the services are worth, in the absence of proof of special value.                                        p. 375

But where services are rendered by a member of the family the presumption of law is that the services are gratuitous.
pp. 375-376

Where the only evidence of an intention to pay fixes the time as at the death of the party to whom the services were rendered, the Statute of Limitations can not attach before that date.
p. 382

In order to justify a claim of services being allowed against a decedent, there must have been a design, at the time of the rendition, to charge, and an expectation on the part of the recipient to pay for the services. The services must have been of such a character, and rendered under such circumstances, as to fairly imply an understanding of payment and a promise to pay. There must have been an express or implied understanding to such an effect.                                        p. 376

The fact that a wife is suing a decedent's estate, for services rendered by her to the decedent, while the husband is suing the estate for board that had been furnished to the decedent, does not render the husband incompetent, on account of interest, from testifying to the wife's suit as to transactions between his wife and the decedent.    p. 383

In such a suit, it appeared that on several occasions, when the plaintiff was sick, the wife employed another woman to assist in caring for the decedent; evidence of such employment is admissible, as tending to show the condition of the decedent and the extent of care and attention the plaintiff was required to give him.    p. 383

The testimony of witnesses who had frequently talked with the plaintiff while she was rendering the services, is admissible, to show that she had said she expected to be paid for them.

p. 383

Without having to be experts, persons who were personally familiar with the character and extent of the services rendered may testify as to what was their value.    p. 384

*Decided January 11th, 1916.*

Appeals from the Court of Common Pleas of Baltimore City.  (GORTER, J.)

Augusta Marx sued the estate of her father-in-law, for services, to him, in nursing him, and carring for his clothes for 559 weeks; the verdict and judgment being in favor of the plaintiff, for $1,000, the defendant, the executor, took this appeal.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*G. Clem Graetzel* and *Frank Driscoll,* for the appellant.

*C. Ross Mace* and *W. Calvin Chesnut* (with whom was *Carroll Hunter* on the brief), for the appellee.

PATTISON, J., delivered the opinion of the Court.

John Marx, by his will executed in May, 1901, devised to his daughter, Gertrude Sippel, fifteen acres of land in Baltimore County. To his son George he gave the sum of two thousand dollars "or the release of the mortgage" for said sum, held by him resting as a lien upon the lands of George. To Charles, another son, he gave two thousand dollars in cash and a designated mortgage, held by the testator, for the sum of six hundred dollars. To each of his daughters, Lizzie Reinecke and Annie Quick, he gave the sum of two thousand dollars, and to his remaining son, John, he gave the residue of his estate, provided he maintained and supported him so long as he lived. Charles was named as his executor.

The testator made his home with John until September, 1901, when he left and went to the home of his son George, where he remained until his death in June, 1912.

The appellee, Augusta Marx, is the wife of George, and this suit is brought by her to recover for services she rendered to her father-in-law, in caring for and attending to him, "including nursing, washing and mending," for the period he was at the home of George, to wit, from September 15th, 1901, to June 16th, 1912, 559 weeks.

The case was tried by a jury in the Court of Common Pleas of Baltimore City, and a verdict rendered in favor of the plaintiff, upon which a judgment was entered. It is from that judgment this appeal is taken.

The law in respect to actions brought to recover for services rendered, such as we find in this case, is now well settled in this State. As between persons not members of the same family, the mere fact of rendering services useful to the party to whom they are rendered, furnishes *prima facie* evidence of their acceptance, and in the absence of some proof to the contrary raises an obligation to pay what they are worth, there being no proof of special value, *Spencer* v. *Trafford*, 42 Md. 20, but this is not the rule where the services are rendered by a member of the family of the person served.

In such cases a presumption of law arises that such sevrices are gratuitous; *Bixler* v. *Sellman,* 77 Md. 496.

The case before us falls within the class of cases last mentioned, and it was so treated by the lower Court and the counsel of the plaintiff in the trial of the case below.

The law applicable to this class of cases is clearly stated in *Bantz, Ex'r.* v. *Bantz,* 52 Md. 686, where it is said: "In order to justify a claim for services being allowed against a decedent, there must have been a design, at the time of the rendition, to charge and an expectation on the part of the recipient to pay for the services. The services must have been of such character, and rendered under such circumstances, as to fairly imply an understanding of payment, and a promise to pay. There must have been an express or implied understanding between the parties that a charge for the services was to be made, and to be met by payment."

The jury, in determining whether there is an implied contract in such cases, should follow the rule laid down in the case of *Guild* v. *Guild,* 15 Pickering, 129, and approved by this Court in *Bantz, Ex'r.* v. *Bantz, supra,* "that if under *all the circumstances of the case* the services were of such a character as to lead to a reasonable belief, that it was *the understanding* of the parties that pecuniary compensation should be made for them, then they might find an implied promise and *quantum meruit."*

The facts found in the record in this case conclusively show that the plaintiff rendered services to the defendant's decedent, and the only question to be determined is whether she is entitled to recover therefor under the law as we have stated it.

The record discloses that the father left the home of his son John because of the treatment of him by John and his children, especially because of the treatment of the children.

George, in his testimony, states that his father said to him, on the occasion that he came to his home, that "John had chased him away," and he asked if he could stay with him.

The home in which George and his wife lived was small, and this fact was mentioned by George; but the suggestion was made by the father that he build an addition to the house and that he would give him the money with which to build it. After saying this, George said, "he walked over to my wife, and he patted her on the shoulder and said, 'I want you to take care of me as long as I live.' He said, 'You will get paid for it at my death.' He said that John should not have the money because he chased him away."

He also testified that his father would often speak of the care and attention given him by the plaintiff to those who from time to time visited his home, and his father would say on these occasions that "she had to do the work for him and after he was dead that there was money enough there to pay for it, that my brother had money enough left out of his estate to pay for it." Witness also spoke of a conversation his father had with Mrs. Willhouck in 1911, after the death of his son John in 1909, in which he told her that the plaintiff "had to do all his work, clean his room and wash for him and make his bed, and after he dies he says he had money enough there to pay for it."

Mrs. Willhouck, to whom we have just referred, was a friend of Mrs. Marx and had for many years visited the home of the plaintiff two or three times a week, and at times when John Marx, senior, was sick would assist her in caring for and attending to him. Mrs. Willhouck testified that on a visit to the home of the plaintiff, shortly after Mr. Marx, Senior, had come there, she had a conversation with him in which he said that he had come to George's to live, "that he was with John but John did not treat him just as he would have liked, the children especially," and that he was going to make his home with George and his wife. "But that Mrs. Marx should not be forgotten when he was dead, because he intended, as he had made a will, and he had intended for each and every one to have two thousand dollars, with the exception that George Marx was to have the

release of the mortgage"; and his daughter Mrs. Sippel "was
to have the other ground. But from the interest and all
that was left that was placed in John's name; that Mrs.
Marx should be paid out of that for doing what she did for
him." Mrs. Willhouck also testified that on subsequent visits
to George Marx, so late as 1911, John Marx, Senior, would
refer to the subject of Mrs. Marx's treatment of him and her
compensation therefor, "that he very seldom spoke of any
of his children with the exception of John that he said *had
his money.* He often spoke of him with regard to having the
money. He said John had his money and that Mrs. Marx
would not be forgotten after he was dead, that he had enough
money that was left there for her services for working and
doing for him." While upon the stand Mrs. Willhouck was
asked—Do you know whether Mrs. Marx expected to be paid
after the old gentleman's death? To which she replied,
"yes, because she often said it."

It is disclosed by the record that at the time of the execu-
tion of the will the testator had considerable money in sev-
eral of the savings banks of the City, and that the bank
books showing such deposits were in the possession of his son
John, where they remained after the father took up his
abode with George. Several years after the testator left the
home of John, he on one occasion said to George, as George
testifies, "it looks funny I am here and my bank books are
down at John's. That is not going to do" and he directed
George "to hook the horse to the buggy" and they would go
down and get them. They went to John's and the father
said to him "John I want those bank books; that money in
those bank books belongs to me" and John gave him the
books. After reaching home the father went to the room of
George, and said to him, handing him the books, "you keep
these, that in case of fire you will know where they are."
George took them and placed them in a drawer, which he
locked, and there they remained for sometime when, on one
occasion, he examined them and not being able to understand

them, as he was "not much on figures," he, in 1904, got one Hedeman, who at times came to his house on business, to examine and to explain the books to him and it was then shown that the aggregate amount on deposit in the banks issuing the books, was $11,964.30. These books, as testified to by George, remained in his possession for nearly two years, when his father said to him "George, you attend to those bank books in town and have the interest put in them." In reply thereto George said "I don't know anything about them banks," and his father said, "what, you don't know anything about the banks? * * * Well then, take them down to John and let John take them down and have the interest put in them." He took them down and gave them to John after telling him, as he had been directed by his father, to carry them to the bank and have the interest put in them. He said "all right" and George never again had the books in his possession. The father thereafter spoke of them but said it made no difference whether the books "laid here or there." He said "the money in these books belonged to him." George also testified that while the books were in his possession not one cent was drawn from bank on them. His father, at such time, had another book upon which he drew what money he needed, although he never saw "inside" that book.

The books remained with John until they were given by him to his brother Charles, this was in consequence of a conversation had by George with John while on a visit, with his wife, to the home of John. At this time John was in bad health and was worried because he had these books and did not seem to know what disposition to make of them. He said his having the books "might make trouble." George said to him "you don't have to worry about that. I will see my attorney tomorrow and I will ask him what you should do about it, and he said alright, I wish you would." George saw his attorney, Mr. Mace, and was told by him that John should give the money either to him (George) or Charles. He thereafter saw John and told him what his attorney had

said. He heard no more from John as to the disposition of the books and did not know what he had done with them until told by Charles that he had given them to him.

This was told him while John was at Sheppard Asylum. In conversation with Charles, George asked him, "Say, Charlie, did John transfer you this money. He said 'Yes, I got that, that is all right.' So I didn't bother any more about it."

After the death of the testator Charles qualified as executor and filed the inventory of his decedent's estate. It contained but two items. The first being the mortgage from George, $2,000.00, and the other "cash on deposit with Alexander Brown & Sons Banks, $6,057.61"—total, $8,057.61.

We have gone very fully into the evidence as to the deposits in the various savings banks of the City of Baltimore, not for the purpose of showing to whom the money so deposited actually belonged, but to show that these deposits were regarded by John Marx, Senior, as his property, and that it was to this money, forming as he thought a part of his estate, that he referred to when he told the plaintiff she would be paid at his death; that, "John should not have it because he chased him away" and did not continue to maintain and support him. It was to this money that he referred when he said, as stated by George, that plaintiff had to do "all his work, clean his room and wash for him and make his bed and after he dies he says that he had money enough *there* to pay for it"; and it was to this money also that he referred in his conversation with Mrs. Willhouck when he said "John had his money and that Mrs. Marx would not be forgotten after he was dead, that he had enough money that was left there for her services for working and doing for him."

In deciding the question here raised we need not determine whether this money belonged to John Marx, Senior. It was thought by him to be his money, and he considered and treated it as part of his estate, out of which the plaintiff was to be paid for her services.

If it was the expectation of Mr. Marx, at the time the services were rendered, that the plaintiff should be paid therefor at his death, out of his estate, and it was her design to charge for such services, the fact that this money was not his and did not form a part of his estate at the time of his death could not defeat the plaintiff's right to recover. The plaintiff was not to look to any special fund or to any particular part of his estate for pay for her services. She was to be paid out of the estate. The fact that this money in bank was so frequently referred to was, no doubt, to give assurance of his ability to pay for such services out of his estate; and we may add that if all this money, transferred from John to Charles, had been regarded and treated as belonging to it and had been returned into the estate of John Marx, Senior, the estate would be sufficient to pay all indebtedness of the testator, including the claim of the plaintiff, as well as the legacies amounting to six thousand dollars; but five thousand dollars of the money transferred by John to Charles was withheld by him, upon the claim that John—a man of very moderate means—who died leaving a widow and five children, gave it to him "in his own right."

The first, second, third and fourth prayers of the defendant asked that the case be taken from the jury. These, we think, were properly refused, as there was evidence sufficient to go to the jury, tending to show not only that the services were rendered by the plaintiff to the defendant's decedent, but also that he, at the time of their rendition, expected the plaintiff to be paid therefor, at his death, out of his estate, as any other debt of his remaining unpaid at such time would be paid out of his estate; and that it was the design of the plaintiff to charge for such service, for she had been told by John Marx, Senior, when called upon to render the service, which she thereafter performed, that she would be paid therefor and she had told Mrs. Willhouck that she expected to be paid for such services. This evidence was certainly sufficient to go to the jury tending to show a design on her

part to charge for her services. The fifth prayer was also properly refused. It was offered on the theory that there was no evidence of an expectation on the part of John Marx, Senior, to pay for the services of the plaintiff and no design on her part, at the time they were rendered, to charge therefor, and that, being a daughter-in-law of the recipient of such services, she was not entitled to recover for them. The eighth, ninth and thirteenth prayers of the defendant as to the Statute of Limitations were also properly refused, as the only evidence in the case as to when the compensation for plaintiff's services were to be paid was that it should be paid at the death of the decedent, and the services were continued to the time of his death. His fourteenth prayer, which confines the plaintiff's right to recover to the existence of a contract, by which she was to receive two dollars per week for her services, was also properly refused, and we find no error in the Court's refusal to grant the defendant's fifteenth prayer.

The first prayer of the plaintiff properly states the law, as to the plaintiff's right to recover in this case, and by her second prayer the law as to the Statute of Limitations is properly stated, and we find no defect in her third prayer.

There are fifteen exceptions in the record relating to evidence. The first is to the action of the Court in permitting the husband of the plaintiff, George Marx, to state what was said by his father to the plaintiff in relation to the services she was to render him and the compensation therefor.

The objection urged against the admissibility of this testimony, if we correctly understand the contention of the defendant, is that the husband and wife are so connected in this suit that a verdict in favor of the wife would result to the benefit of the husband, and for such reason he should be regarded as one of the parties to the suit.

The wife, the plaintiff, is suing for services rendered by her to the decedent, while the husband is suing in another action for board furnished by him to the decedent. To hold

that the husband is not competent to testify as to transactions between his wife and the decedent, in a suit by her against him for personal services rendered by her to him because he might, as her husband, be benefited by the recovery of a judgment by her, would not only be extending the meaning of the "Evidence Act," section 3, Article 35 of the Code of 1912, beyond that heretofore given to it, but such a construction of the Act, we think, would be unwarrantable.

The second exception was to the action of the Court in allowing the said witness to testify that at times when the decedent was sick the plaintiff was unable to care for him without assistance and that Mrs. Willhouck assisted her, and on one or more occasions the plaintiff paid her for her services. This evidence tends to characterize the condition of the decedent and to show the extent of care and attention that the plaintiff was required to give to him, and as the amount of compensation to which she was entitled was dependent upon the character and extent of the services rendered, this testimony was admissible for such purpose, if for no other.

The third and ninth exceptions were to the action of the Court in permitting both George Marx and Mrs. Willhouck to state that the plaintiff was expecting pay for her services. She, during the period of the performance of these services, had frequent conversations with these witnesses in relation thereto, and had at such times not only expressed herself in a general way indicating that she was expecting pay for such services, but had said in express terms that she expected to be paid therefor and discussed with them certain facts and circumstances in connection therewith; it had previously been disclosed in the course of the trial that the plaintiff had been approached by the decedent and had been asked by him to perform these services, with a promise from him, made at such time, that she should be paid therefor. Therefore, we think, it was proper to admit this evidence as showing that at the time of the rendition of these services there was a design on her part to charge therefor and that she expected to be paid for them.

The fourth and tenth exceptions were to the admission of evidence as to the value of the services rendered by the plaintiff.

These witnesses, George Marx and Mrs. Willhouck, were not testifying as experts, but as persons familiar with the character and extent of the services rendered. The husband was present much of the time when the services were being performed, and the other witness was at the home of the plaintiff two or three times each week and at times assisted her in performing such services, and was, as she states, familiar with the value of these services. This evidence, under the facts and circumstances stated, was properly admitted.

The fifth, sixth, seventh, eighth, eleventh, twelfth, thirteenth, fourteenth and fifteenth exceptions are to the admissibility of certain testimony given in relation to the deposits in bank. This evidence, as we have said, was not offered to show to whom the money actually belonged, but for the reasons heretofore stated, and was not, we think, improperly admitted.

The judgment of the lower Court will be affirmed.

*Judgment affirmed, with costs to the appellee.*