G. CARROLL JONES *vs.* WILLIAM J. JONES, ADMINISTRATOR C. T. A.

*Action Against Administrator—Board Furnished Decedent— Evidence—Family Relationship.*

In an action against an administrator for board furnished decedent and a young man who had lived with decedent from childhood, evidence as to the amount and character of the young man's employment while the board was being furnished was irrelevant.                                    p. 23

Defendant administrator having testified that he had heard his decedent say a month before his death that he owed plaintiff money, it was proper to ask him why, that being so, he refused to pay the bill for board in suit.                          p. 24

In connection with the presumption of law that services rendered by a member of the family of the person served were gratuitous, the word "family" means a collective body of persons who form one household, under one head and one domestic government, and who have reciprocal natural or moral duties to support and care for each other.                          p. 25

That decedent was the great-uncle of plaintiff's wife does not constitute such relationship between him and plaintiff as,

standing alone, will create the legal presumption that services were gratuitous.                                    p. 25

In the absence of a family relationship such as to raise a presumption that services rendered were designed to be gratuitous, the law implies a promise to pay for services rendered and accepted, and the burden is on the party resisting payment to show that no charge was to be made.          pp. 25, 26

Evidence that decedent moved to plaintiff's house, taking with him a young man who had been reared by him and his deceased wife, after the refusal of accommodation for the young man by another person, decedent expressing his intention to keep the young man with him even if this involved going to a hotel, that decedent told witnesses that they were going to plaintiff's home to live, and that he was going to pay plaintiff board, that after being at plaintiff's house two weeks, he made a payment to plaintiff and cancelled a debt due him by the latter, and later declared that he owed plaintiff money, *held* to tend to show the intention of decedent to pay for the board of himself and his young friend.                          p. 26

*Decided June 20th, 1924.*

Appeal from the Circuit Court for Wicomico County (DUER and BAILEY, JJ.).

Action by G. Carroll Jones against William J. Jones, administrator *c. t. a.* of J. Zeph Graves, deceased. From a judgment for defendant, plaintiff appeals. Reversed.

The cause was argued before PATTISON, URNER, ADKINS, OFFUTT, and DIGGES, JJ.

*F. W. C. Webb,* with whom were *Woodcock & Webb* on the brief, for the appellant.

*F. Leonard Wailes* and *Levin C. Bailey,* with whom were *Ellegood, Freeney & Wailes* on the brief, for the appellee.

DIGGES, J., delivered the opinion of the Court.

This is an appeal from a judgment in favor of the appellee, defendant below, the judgment having been directed by

the Circuit Court for Wicomico County, in granting the prayer of the defendant, offered at the close of plaintiff's testimony as follows:

> "The defendant prays the court to instruct the jury that in this case there is no evidence legally sufficient to establish any definite and enforcible contract, express or implied, between the plaintiff and the defendant's decedent, J. Zeph Graves, for the payment of board, and that, therefore, their verdict must be for the defendant."

The suit was instituted by G. Carroll Jones against William J. Jones, administrator,- *c. t. a.* of the estate of J. Zeph Graves, deceased, to recover the sum of $1,140, alleged to be due the plaintiff for board furnished by him to J. Zeph Graves and Paul McGarry, from September 5th, 1920, to February 23rd, 1922, the date of the death of J. Zeph Graves.

The declaration is in assumpsit and contains the usual money counts.

J. Zeph Graves was a native of St. Mary's County, where he lived with his wife Sarah Elizabeth Graves until they removed to Salisbury, Wicomico County, some years before his death.

Mr. and Mrs. Graves had no children, and in 1901 they took Paul McGarry, then about six years of age, from an orphan asylum, and he remained with them and the survivor until Mr. Graves died. The three lived together in Salisbury, on Hammond Street, up to June 1st, 1920, upon which date the death of Mrs. Graves occurred. After her death Mr. Graves and McGarry continued to live on Hammond Street until August 21st of the same year, at which time they moved on Marshall Street, to the house of the plaintiff G. Carroll Jones. Mr. Graves continued to live at the home of the plaintiff to the time of his death, February 23rd, 1922, and Paul McGarry is still living there.

Mr. J. Zeph Graves left a last will and testament, by which all of his property was devised and bequeathed to his

wife. This will was dated December 28th, 1907, and, as stated, his wife predeceased him.

The plaintiff is not a blood relative of J. Zeph Graves. Mr. Graves, however, was the great uncle of the plaintiff's wife, her father, William J. Jones, the administrator, being a nephew of Mr. Graves. Mr. William J. Jones has been twice married, his present wife being a niece of Mrs. J. Zeph Graves, one of her heirs at law, and as such is entitled to a portion of the property devised and bequeathed by Mr. Graves to his wife.

Defendant's prayer above quoted is, in effect, a demurrer to the whole evidence produced by the plaintiff, in so far as that testimony proves or tends to prove a contract for board between the plaintiff and J. Zeph Graves. For the purposes of the prayer it admits the truth of the testimony, but denies its legal sufficiency to establish an enforcible contract.

This testimony, which for this purpose is conceded to be true, shows that, after the death of Mrs. Graves, Mr. Graves talked to Mrs. William J. Jones, the wife of the defendant, about moving to her home to live, that she would not take Paul McGarry, and that Mr. Graves would not go any place he could not take McGarry; that subsequently, he asked G. Carroll Jones, the plaintiff, if he would take McGarry and himself to board, that the plaintiff said yes; and they went to plaintiff's home to live August 21st, 1920. That before and after they moved to the home of the plaintiff, Mr. Graves told the plaintiff and others that he was willing to pay the plaintiff whatever the trouble was worth; that shortly before Mr. Graves moved to the home of the plaintiff, he had a sale of some of his personal effects, that the plaintiff attended the sale and purchased articles to the value of $22.50, but did not pay for same at the time of purchase; that after Mr. Graves and McGarry had been at the home of the plaintiff two weeks they had a settlement, whereby Mr. Graves paid the plaintiff $7.50 and cancelled the bill of $22.50 due him by the plaintiff; that Mr. Graves told the defendant, about one month prior to his death, that he, Graves, owed the plaintiff some money, and told McGarry, two days before he died, that he

wanted to have his will prepared, that he owed Carroll Jones money and wanted to pay him, and that he was going to settle with Carroll in cash or have preparations made for it in his will; that no settlement was demanded by the plaintiff, and none was made by Mr. Graves, other than the payment of the $7.50 and the cancellation of the debt due by the plaintiff for goods bought at the sale.

The record contains five exceptions, four to the rulings of the court on the testimony, and the fifth to the action of the court in granting the prayer of the defendant, above quoted. We will first consider the questions of evidence presented by the first four exceptions. The first three grow out of the refusal of the court to sustain objections, made on behalf of the plaintiff, to questions propounded to Paul McGarry on cross-examination, and are questions numbers 50, 51 and 52. The witness had previously stated in answer to question 49, that Mr. Graves lived for about seventy-two weeks after they went to the home of the plaintiff.

"Q50. How much of that seventy-two weeks did you have employment? A. I suppose off and on I had about one month of the seventy-two weeks. Q51. By whom were you employed during that one month? A. By the American Railway Express. Q52. Well now, during the time you were staying in the Jones' home, from the time you went there until Mr. Graves' death, you worked about one month; is that correct, sir? A. Yes, sir."

We are unable to determine the purpose of these questions, but, regardless of the purpose, they were totally irrelevant. The issue being whether or not there was a contract, express or implied, between Mr. Graves and the plaintiff for board furnished by the plaintiff to Mr. Graves and McGarry, and for the payment of which Mr. Graves or his estate was liable. How long, and for whom McGarry worked, during the period that Mr. Graves and himself lived at the home of the plaintiff, could have no legitimate bearing upon the issue, and the objection to each of the questions should have been sustained.

The fourth exception is to the action of the court in sustaining an objection to a question, propounded on behalf of

the plaintiff, to the defendant. "Q21. Mr. Jones, you are the administrator of the estate of Mr. Graves and, as you said, you heard Mr. Graves say before his death that he was indebted unto Carroll Jones; if that be so why did you decline to pay this bill to Mr. Jones?"

The defendant had just previous to the above question testified that he had heard his decedent, Mr. Graves, say just a month before his death that he owed Carroll Jones some money; he, the administrator, had refused to pay the bill then in suit, and his reason for so refusing was a competent and pertinent inquiry. We think the question should have been permitted.

We come now to the question presented by the granting of the defendant's prayer, by which the court directed a verdict for the defendant, and which constitutes the fifth exception.

The theory of the prayer is that the board furnished, and the service rendered Mr. Graves and Paul McGarry by the plaintiff, were presumed to be gratuitous, and the trial court, by granting the said prayer, decided that the testimony on behalf of the plaintiff failed to rebut that presumption. We are unable to agree with this view. The question of law involved in this prayer has been frequently considered by this Court.

In the case of *Bantz* v. *Bantz,* 52 Md. 693, the rule was stated to be: "In order to justify a claim for services being allowed against the decedent, there must have been a design, at the time of the rendition, to charge, and an expectation on the part of the recipient to pay for the services. The services must have been of such a character, and rendered under such circumstances, as to fairly imply an understanding of payment, and a promise to pay. There must have been an express or implied understanding between the parties that a charge for the services was to be made, and to be met by payment."

In *Bixler* v. *Sellman,* 77 Md. 496, Judge Fowler, after citing with approval the rule as laid down in *Bantz* v. *Bantz, supra,* said: "The rule as here laid down applies only when a claim of this character is made by a member of the family

of the decedent, for of course it must be conceded that generally the law implies a promise to pay for services rendered and accepted; but a well recognized distinction exists where the service is rendered by a member of the family of the person served. In the latter case a presumption of law arises that such services are gratuitous."

Other decisions to same effect are: *Wallace* v. *Schaub,* 81 Md. 598; *Gill* v. *Staylor,* 93 Md. 472; *Harper* v. *Davis,* 115 Md. 349; *Giering* v. *Sauer,* 120 Md. 295.

The test is, were the services, for which compensation is being demanded, rendered by one who is of the same family as the recipient, family, as here used, meaning a collective body of persons who form one household, under one head and one domestic government, and who have reciprocal natural or moral duties to support and care for each other.

Mr. Graves was the great uncle of the wife of the plaintiff, and was related by affinity to the plaintiff in the same degree. This relationship is not of such a character as, standing alone, will create the legal presumption that the services here shown to have been rendered were gratuitous. Nor does the evidence, as disclosed by the record in this case, sustain the view that Mr. Graves and Paul McGarry were members of the "family" of the plaintiff, when tested by the definition of that word, as employed in this class of cases. It is true that Mr. Graves took with him to the home of the plaintiff some bed room furniture, and that he and McGarry ate at the same table with the plaintiff and his wife, but these acts do not make them members of the family. It is not uncommon for one to board at the home of an acquaintance or friend to carry with him some articles of furniture which might add to his convenience and comfort; and it is rather the rule than otherwise for boarders to take their meals with the family.

In the case of *Neudecker* v. *Leister,* 132 Md. 571, after stating the rule as to services being presumed to be gratuitous when rendered by one occupying the position of a member of the family, it was said in the opinion by Judge Urner: "But, except where the natural or actual relations of persons as members of the same family are such as to raise the pre-

sumption that their services were designed or understood to
be gratuitous, the law implies a promise to pay for services
rendered and accepted, and the burden is on the party re-
sisting payment to show that no charge was to be made, if the
rendition and acceptance of the services are proven." *Marx*
v. *Marx,* 127 Md. 373.

The proof in this case shows that the services were ren-
dered under such conditions, circumstances and relationship,
as to preclude the theory of their having been gratuitous, and
to raise an implied promise to pay.

We must also consider and give proper weight to the evi-
dence disclosing Mr. Graves' intention to pay for the services,
as expressed in his declarations, both before and after he and
McGarry went to the home of the plaintiff to board. He
moved to the home of plaintiff, and took McGarry with him,
the young man who had been reared by himself and his de-
ceased wife from a boy of six years of age, after he had ap-
plied at the home of the defendant, and was told by the
defendant's wife she would not take McGarry. Mr. Graves
then said he would not go anywhere he could not take Paul,
but would go to a hotel and keep him first.

The record further shows that Mr. Graves told several wit-
nesses that he and McGarry were going to the home of the
plaintiff to live, and that he was going to pay the plaintiff
board, although not expressing the amount. This evidence
of the deceased's intention to pay for the board and service
rendered himself and McGarry is corroborated by the fact
that, after being at the home of the plaintiff for about two
weeks, he paid the plaintiff the sum of $7.50 and cancelled a
debt which the plaintiff owed him amounting to $22.50, and
by the subsequent declaration of the deceased to witnesses,
including the defendant, that he owed Carroll Jones some
money.

It follows from what we have said that the judgment must
be reversed.

*Judgment reversed and new trial awarded, with*
*costs to the appellant.*