KELLER *v.* KELLER, Administratrix of the Estate
of Mary A. Keller, ET AL.

[No. 292, September Term, 1969.]

*Decided April 6, 1970.*

The cause was argued before HAMMOND, C. J., and
BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and
DIGGES, JJ.

*Charles E. Wehland,* with whom was *Charles N. Ket-
terman* on the brief, for appellant.

*Orrin J. Brown, III,* with whom were *Charles E. Hogg* and *Bernard F. Goldberg* on the brief, for appellees.

FINAN, J., delivered the opinion of the Court.

Henry R. Keller, appellant, is a bachelor, 45 years of age, who made his home with his mother, Mrs. Mary E. Keller, until her death in July of 1966. Between July, 1941 and the date of his mother's death, he alleged that he advanced to her, or on her behalf, funds amounting to $75,000 on the expectation and understanding that he would be reimbursed after death from her estate. Before the expiration of the six months notice to creditors he filed suit for his claim against the administratrix of the estate, who was his sister Mary E. Keller (defendant-appellee). The mother died divorced and intestate leaving surviving her, seven children, namely: Ella Sherer, Lawrence Keller, Raymond Keller, John Keller, Isabelle Resch, Henry Keller, the plaintiff and Mary E. Keller, the administratrix. Henry's claim was rejected in the orphans' court by the administratrix and he then filed suit in the Circuit Court for Howard County, where it was heard by Macgill, J., without a jury and again rejected. It is from the judgment in favor of the administratrix that this appeal is taken.

The administratrix, by way of defense, filed both a general issue plea and a plea of limitations but later withdrew the plea of limitations. However, Isabelle Resch and Lawrence Keller intervened in the case and Mrs. Resch filed a motion to strike the withdrawal of the limitations plea. We need not here concern ourselves with the issue of limitations as the circuit court, reserving the question of limitations, found for the administratrix on the merits of the case and hence did not reach that issue. Since we are affirming the judgment of the lower court we also need only address ourselves to the merits of the case.

The records show that the father of the parties left the family home in 1948 and the mother divorced him in

1952. The son Raymond left home in 1947 and the son John left the home in 1959. From that time on only Mary and Henry remained at home with the mother. Mary testified that she paid for her own maintenance but did not contribute anything to the support of the mother. In fact none of the children claim to have contributed to the support of the mother or to have advanced her any funds, except the plaintiff Henry.

Henry's claim apparently dates back to 1946 or 1947 when he opened an account in the Commercial and Farmers Bank and gave his mother permission to draw and cash checks on the account and sign his name to the checks. It would further appear that the vast majority of these checks involved expenditures for the maintenance of the decedent's household. A few were for items which probably benefited Henry, such as payment for lumber, concrete, gas, sharpening a chainsaw and a lawn mower and rent for a freezer locker. A large number of checks were made payable to George Wehland who operated a grocery store. Thirty five checks were made payable to Raymond Keller. The sister, Mary Keller, testified that Raymond took unto himself a bride and the mother asked Henry to let Raymond have money to launch this venture. There was no testimony as to whether Raymond ever reimbursed anyone for this stake. There were literally hundreds of checks involved covering a period of thirteen years and by the count of the plaintiff's counsel the funds totaled $15,636.23. The checking account was closed in 1959 and thereafter Henry paid his mother the sum of $30.00 in cash each week and of this amount $10.00 was for his board and lodging and $20.00 for his mother's needs. There was also evidence that Henry would on occasion bring produce and meat for the table. The sister Mary Keller testified that to her own personal knowledge checks totalling $10,267.25 were used by the decedent for household purposes. Although this was not rebutted, the lower court may have had some qualifications as to the accuracy of this testimony as Mary was a girl in her teens when the drawing of the

checks on the bank account first started. The court below expressed irritation over the fact that, "Unfortunately, no attempt was made at chronological order [in photostating the checks after they had been introduced in evidence] and the sheets containing the photostats, contain checks unrelated as to time and in no particular sequence." The sister Mary Keller also testified that she was present when her mother told her sister, Isabelle Resch "she owed Henry money for years back when he took care of me and I am going to leave what I have to Henry." A brother, John Martin Keller, said his mother told him on several occasions that Henry paid her no board but "gave her cash money at a time or two" and "she was to pay him back, it was supposed to come out of the property."

This about sums up the evidence most favorable to Henry. To be weighed against this exchange of filial devotion and maternal gratitude is other evidence. Henry paid no room or board to his mother until after the checking account was closed in 1959, except for a period during World War II when he worked in a shipyard. Henry was a farmer, who first worked for others, later leased farms and operated them for himself. He cleared twenty-five acres of his mother's property and made this the base of operations. There is no evidence that he ever paid her any rent for this use of her property.

There was also testimony from a niece of Henry's, Mrs. Mary Spacek, daughter of Isabelle Resch. She testified that sometime between 1960 and 1962 while in the presence of her grandmother, she heard her grandmother remark that, she wanted it known that she was taking care of herself and was paying her own way from the rent from the store and her own income.

There was evidence that Henry had helped fix up a store on the property in 1952, from which the mother received rent, first at $35 per month until 1956, then $80 per month until 1961 and finally from 1961 until her death she received $115 per month. It should also be remembered, as her daughter Mary testified, Mrs. Keller

was a "frugal woman," or as her granddaughter described her, "I mean, she never bothered about the things women do today, I mean she could live on a dollar." We find support for this in the fact that she did not put electricity into her house until 1957.

There was also an interesting transaction, which while apparently having nothing to do with the advances Henry allegedly made to his mother, at least shows that he received favored consideration during his mother's lifetime not extended to the other children. In May, 1955, Mrs. Keller mortgaged her property for $10,000 and paid over the proceeds to Henry, who at that time had need for the money. Henry made the payments on the mortgage to the bank and at the time of his mother's death a balance of $2,000 remained.

By far the most favorable witness for Henry was the administratrix, his sister Mary. However, the thrust of her testimony was that the agreement, if there was one, between Henry and his mother, was in the nature of a contract to devise which, if proven, would be enforceable in equity. *Evans v. Buchanan*, 183 Md. 463, 471, 472, 38 A. 2d 81 (1944) ; *Neal v. Hamilton*, 159 Md. 447, 150 A. 867 (1930) ; *Soho v. Wimbrough*, 145 Md. 498, 510, 125 A. 767 (1924). On the other hand, another favorable witness, brother John, came up with a version that supports a different theory of the case, namely, that the advances made by Henry were to have constituted a claim against the mother's real estate. The action Henry filed at law was predicated on this latter theory and in order for him to be successful he had to show, by clear and convincing testimony, that there was an express or implied contract between him and his mother that she intended to repay him for the advances given her and that they were in the nature and character of loans and were intended to be understood as such. As late as *Shaefer v. Hewes, Executor*, 225 Md. 207, 169 A. 2d 923 (1961), this Court restated the principle of law applicable to the case at bar, the difference being, in *Shaefer*, we were faced with a situation involving services rendered, whereas in the in-

stant case the claim is predicated on advances. Judge Marbury, speaking for the Court, stated:

> "Under Maryland decisions services rendered for a decedent by a member of his family give rise to a presumption that the services were rendered gratuitously so that the plaintiff must show that the services were performed under circumstances so as to demonstrate a reasonable expectation that there would be compensation. *Zahn v. Heil,* 192 Md. 576, 64 A. 2d 564; *Roycroft v. Nellis,* 171 Md. 136, 188 Atl. 20; *Doyle v. Gibson,* 119 Md. 36, 85 Atl. 961; *Gill v. Staylor, supra."* 225 Md. at 211.

To similar effect see also *Lowe v. Lowe,* 111 Md. 113, 117, 73 A. 878 (1909); *Bixler v. Sellman,* 77 Md. 494, 497, 27 A. 137 (1893); *Bantz v. Bantz,* 52 Md. 686, 693 (1880). Indeed the consensus of these cases, and there are a number collected in Vol. 10 M.L.E., *Executors and Administrators,* §§ 101, 102 and 103, is summed up in the statement from the vintage case of *Bixler v. Sellman, supra,* to the effect that:

> "As was said by the Supreme Court of Pennsylvania 'such a claim as this is pregnant with danger, as well to the rights of creditors, as to the other heirs, and cannot of course be entitled to countenance from the court, unless accompanied with clear proof of an agreement not depending upon idle and loose declarations, but on unequivocal acts.' " 77 Md. at 497.

Judge Macgill while not finding any contract, express or implied, between Henry and his mother, was further not satisfied with the weight and quality of the evidence offered in authentication of the advances, assuming a contract had existed. In a well reasoned and lucid opinion, he found for the defendant stating:

> "In *Bantz v. Bantz,* supra [52 Md. 686 (1880)], it was stated by the Court that the dec-

laration by a mother, testified to in a suit by a son against her estate, that her son 'should not be the loser' and he 'should be well paid' could not be construed as referring to any payment other than a gratuity by will. See, also, *Bixler v. Sellman, supra* [77 Md. 494, 27 A. 137 (1893)]; *Duckworth v. Duckworth,* 98 Md. 92 [56 A. 490 (1903)], and *Lowe v. Lowe, supra* [111 Md. 113, 73 A. 878 (1909)].

"This Court is of the opinion, however, that even if it be assumed that the proof is sufficient to establish an express agreement or an implied agreement that the Plaintiff was to be reimbursed for his expenditures out of his mother's estate, the evidence is not such as to enable a finding to be made, with any degree of accuracy, as to the exact, or even approximate, amount advanced and agreed to be repaid. *Shipley v. Shilling,* 66 Md. 558, 563, 564 [8 A. 355]. *Duckworth v. Duckworth, supra.* * * * Under the circumstances it does not appear unreasonable to suppose that at least a portion of the weekly checks theretofore made payable to cash represented a payment for the board and lodging of the Plaintiff. * * * It seems probable that he was a dutiful and considerate son to whom his mother owed gratitude. This, in itself, however, is not sufficient to raise an implication of an agreement that he was to be paid for what he did and that what he did was done on such an understanding.

\* \* \*

"This Court, on consideration of the evidence, is not satisfied that the Plaintiff has established by a preponderance of the evidence that there was either an express or implied promise on the part of the deceased to pay the amount claimed or any part of it and, in any event, assuming such a promise, the evidence would permit no

more than a speculation or guess as to what amount or what items of payment were the subject of such a promise."

We are of the opinion that the trial judge correctly interpreted the law and the facts. Maryland Rule 886 a.

*Judgment affirmed, appellant to pay costs.*