WILLIAM L. SCHAEFER, PERSONAL REPRESEN-
TATIVE OF THE ESTATE OF MAUD A.
SCHAEFER *v.* MARGARET E.
HEAPHY

[No. 817, September Term, 1979.]

*Decided March 6, 1980.*

The cause was argued before MOORE, MASON and WILNER, JJ.

*J. Marcus Slowiak* for appellant.

*Gregory L. Stephenson,* with whom were *Connell & Clinton* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

After suffering from the progressively debilitating effects of emphysema for several years, Maud Schaefer finally died on February 19, 1978. She left no Will; and, on April 5, 1978, her son William Schaefer was appointed by the Orphans' Court of Anne Arundel County as personal representative of Maud's Estate.

On October 2, 1978, Mrs. Schaefer's sister, Margaret (May) Heaphy, filed a claim in the Estate for $24,050. The claim was in two parts. The first was for $9,950, representing "Services rendered as Housekeeper and Companion" at $50.00 a week for the 199-week period from June, 1972, to March, 1976. The second part was for $14,100, for "Services rendered as Housekeeper, Companion and 24 hour nursing care" at $150.00 a week for the 94-week period from March, 1976, to February, 1978. Mr. Schaefer denied the claim, whereupon Mrs. Heaphy filed a written request with the Register of Wills for a hearing before the Orphans' Court.[1] A bifurcated

---

1. Her letter to the Register, filed December 8, 1978, was docketed in the files of the Orphans' Court. It said, in its entirety: "I am requesting the scheduling of a hearing regarding the disallowance of claims filed by me, Margaret E. Heaphy, on the 2nd day of October, 1978, against the estate of Maud A. Schaefer."

evidentiary hearing was, in fact, held on January 25 and April 10, 1979, following which the court disallowed the first part of the claim — for services rendered during 1972-1976 — entirely, and allowed $2,000 on the remaining part of the claim. The court did not explain how it arrived at its decision to allow the sum of $2,000.

William has taken a direct appeal from that allowance to this Court (Courts article, § 12-501), contending that (1) the Orphans' Court had no jurisdiction to entertain his aunt's claim in the first place, (2) it erred in permitting Mrs. Heaphy to testify, and (3) Mrs. Heaphy did not overcome the presumption that such services as she rendered to her sister were gratuitous and without promise or expectation of payment. We disagree with appellant's first claim, agree with his third, and need not consider his second.

### (1) Jurisdiction of the Orphans' Court

For 167 years, the law was quite well settled in this State that, although an orphans' court had the authority to "allow" or "disallow" claims filed against a decedent's estate, it had no "jurisdiction" to adjudicate their validity. The precise issue before us is whether that was changed with the 1969 revisions to the testamentary article of the Code (then Art. 93, now Estates and Trusts article).

The orphans' courts have always been considered as courts of special and limited jurisdiction, exercising only those powers specifically conferred by law. *See Crandall, Exec. v. Crandall,* 218 Md. 598, 600 (1959). Their ability to render final judgments with respect to creditors' claims therefore depends upon the scope of statutory authorization in that regard.

The first comprehensive enactment dealing with the State testamentary law, and thus with the functions and powers of the orphans' courts, appears to have been Laws of Md., 1798, ch. 101.[2] In subchapter 9, § 13 of that Act, the General Assembly declared that:

"... [N]o executor or administrator shall be obliged

---

2. In a preamble to that 1798 Act, the General Assembly stated a truism that, for many people, has remained valid to this very day: "[T]he laws and

to discharge any claim, of which vouchers and proofs shall be exhibited as aforesaid, but may reject, and at law dispute the same, in case he shall have reason to believe that the deceased never owed the debt, or had discharged the same, or a part thereof, or had a claim in bar; *but every executor or administrator shall be obliged to discharge the same, or pay a just proportionable part thereof, if passed by the orphans court granting his letters, unless he shall appeal from the decision of the court in the manner hereafter directed."* (Emphasis supplied.)

Provisions for appealing the decisions of the orphans' court, to which the underscored language in § 13 undoubtedly referred, were set forth in subchapter 14, § 18 of the Act. Section 18, in relevant part, stated that "[a]ny person who may conceive him or herself aggrieved by any judgment, decree, decision or order, of the orphans' court, shall have the liberty of appealing to the court of chancery, or to the general court of the shore whereon such orphans court is held. . . ." This appeal was to be heard on the record made in the orphans' court, with the appellate court either affirming the decision below or directing "in what manner it shall be changed or amended."

Although presumably subject to the superior authority of the appellate court, should an appeal be taken, provision was made in § 20 of subchapter 14 that "every judgment, decree, decision or order, of the said [orphans'] court, may be enforced by attachment and sequestration as aforesaid; and if the said judgment, decree, decision or order, be for paying money, the property sequestered may, at the discretion of the court, be applied to the purpose for which such judgment, decree, decision or order, was given."

regulations relative to the estates of deceased persons, comprehending a great variety of subjects, and interesting to citizens of every description, not only are become complicated and difficult to be understood, but are found by experience to be greatly inadequate to the purposes for which they were framed." Compare the statement in the transmittal letter of the (1968) Second Report of the Governor's Commission To Review and Revise the Testamentary Law of Maryland: "There is no field of Maryland law whose statutory framework is more archaic, disorganized, cumbersome and illogical." *Plus ca change, plus c'est la meme chose.*

Although the Court of Appeals had no opportunity to consider the nature and extent of an orphans' court's "jurisdiction" in this area under the 1798 Act, and thus no definitive statement of it appears, the combination of these provisions would seem to indicate that, under that Act, an orphans' court could render a binding judgment, enforceable against the executor, with respect to creditors' claims. Unless the executor or claimant successfully appealed an adverse decision, the order of the orphans' court allowing or disallowing the claim would stand. If the claim were disallowed, it would not be paid; if allowed, the executor was "obliged to discharge the same."

This was significantly changed, however, by Laws of Md., 1802, ch. 101. In section 9 of that Act, the General Assembly declared that,

> ". . . in no case shall the order made by the orphans court, or by the register of wills, that an account or claim will pass when paid, be deemed of validity to establish such account or claim, but in case the executor or administrator thinks fit to contest the same, such account or claim shall derive no validity from the order aforesaid, but shall be proved in the same manner as if no such order had been made."

This provision, in substantially the same form, remained part of the statutory law of Maryland until 1969; [3] and, during the period of its existence, it was given full effect by the Court of Appeals. That effect was first explained in *Levering v. Levering,* 64 Md. 399, 413-414 (1885), as follows:

> "The Orphans Court can pass upon claims against the estates of decedents, but its determination is not final or conclusive. If the claim is disallowed, the claimant is not precluded from seeking his remedy in a Court of law or equity. If the claim is allowed, the executor or administrator may refuse to pay it. The decision of the Orphans Court is only *prima*

---

3. *See* Md. Ann. Code, 1964 Repl. Vol., art. 93, § 108. *See also* Laws of Maryland, 1969, ch. 3.

*facie,* and if the claim is allowed, only operates as a protection extended to the executor in the event of its liquidation by a disbursement of the funds held by him in his representative capacity [citations omitted].

\* \* \*

"The Orphans' Court with its limited powers and circumscribed jurisdiction, cannot finally and conclusively determine any claim brought by a creditor against the estate of a decedent.

"The adjudication and conclusive determination of matters in controversy between an executor or administrator and creditors, appertain 'exclusively to the Courts of law and equity.' "

The reasoning, and conclusion, of the Court, though eminently pragmatic, seem to have been somewhat indirect. There was no question about the authority of the orphans' court to "pass upon" creditors' claims; to that extent, at least, the court would have had subject matter "jurisdiction" over such claims. The nub of the matter was that because either party could ignore the decision of that tribunal and have the issue litigated *de novo* in another court, there was no way in which the orphans' court could enforce its determination. What it seems to have lacked was not so much "jurisdiction," in the traditional sense of the word, but rather the ability to render a final, binding, and enforceable judgment. The court was competent to consider the matter, but not competent to effectively resolve it.

The rationale underlying the conclusions reached in *Levering* became unimpeachable with the enactment of Laws of Md., 1920, ch. 674, which, as once amended and codified in 1957 Code, art. 93, § 120, provided that,

"If a claim shall be asserted against or exhibited to an administrator or executor in any form, whether sworn to or passed by the orphans' court or not, and he shall refuse payment thereof in writing, such claim shall be forever barred unless the creditor

shall bring suit upon the same within six months [originally nine months] after such rejection."

This statute of limitation cemented the impotence of the orphans' court in the area of creditors' claims. Not only could the executor ignore the allowance of a claim by the orphans' court, but if the "successful" creditor failed to file his action in the circuit court within the allotted time, his claim was extinguished, in absolute derogation of the orphans' court order. Thus it was that the Court of Appeals could say in *Montgomery Co., Etc. v. Donnally,* 195 Md. 442, 446 (1950),

> "If a claim is filed against an estate being administered in the Orphans' Court and the representative of that estate refuses payment, the Orphans' Court has no jurisdiction to adjudicate the claim and the claimant must institute suit on the claim against the personal representative in a court of law." [4]

If this is still the law, we might be in a curious position of having to dismiss the appeal for want of a final judgment rather than reversing an invalid order of the orphans' court because of its lack of jurisdiction. Our lack of jurisdiction would be paramount over that of the orphans' court. The question, however, is whether the Legislature conferred the requisite "jurisdiction" in the 1969 revision, and thus made moot the doctrines enunciated in *Levering* and its progeny.

At first blush, the answer would seem to be "no." The basic jurisdiction of the orphans' court, in the revised article, is set forth in § 2-102 (a) (Estates and Trusts article, hereafter referred to as "ET" [5]). This provides, in relevant part,

> "The court may conduct judicial probate, direct the conduct of a personal representative, and pass

---

4. *See also Marbury v. Ward,* 163 Md. 330 (1932); *State v. Md. Casualty Co.,* 164 Md. 69 (1933); 10 M.L.E., *Executors and Administrators,* § 125.

5. The 1969 revisions (Laws of Md., 1969, ch. 3) constituted a rewriting of art. 93 of the Code. The revised article, by reason of the progressive recodification of the entire Maryland Code, now appears as the Estates and Trusts article. For convenience, we shall use the current designation.

orders which may be required in the course of the administration of an estate of a decedent. ... The court shall not, under pretext of incidental power or constructive authority, exercise any jurisdiction not expressly conferred."

The Comment to this section, as it was enacted in 1969, states that it was derived from former sections 259 and 289 of art. 93. It states also that *"[t]he statute* is not intended to change the existing powers of the Court except in two instances" not directly relevant here. (Emphasis supplied.) Read in context, it would appear that the phrase "[t]he statute" means the entire revised article, rather than just § 2-102, thus suggesting the continued vitality of the *Levering-Donnally* doctrine.[6]

A clearly contrary intent, however, appears in Title 8 of the article, dealing specifically with creditors' claims; and this, we believe, is controlling.

ET, § 8-101 (b) states that, after appointment of the personal representative and until the estate is closed, "the procedures prescribed by § 8-104 shall be followed" in enforcing claims against the estate. Section 8-104 provides three methods of presenting claims: (1) delivery to the personal representative; (2) delivery to the register of wills; or (3) commencement of a lawsuit against the estate (or a distributee of estate property) within the time allotted for filing claims.

If the creditor chooses the third option — direct resort to a court of law or equity — his success or failure will, of course, depend upon the judgment rendered therein. Section 8-107 (d) provides that "[a] judgment in an action against a personal representative to enforce a claim against the estate of a decedent is an allowance of the claim."

---

6. The two instances referred to in the Comment are (1) the authority of the Register of Wills under § 5-301 to conduct and superintend administrative probate, in effect a withdrawal of jurisdiction from the court, and (2) the inclusion, by virtue of § 1-301, of realty as part of the probate estate, thus extending the court's probate jurisdiction to that hitherto excluded form of property. Neither of these changes is apparent from § 2-102 itself, however, thus leading one to conclude that, in the context used, "[t]he statute" takes in more than § 2-102 alone.

If the creditor uses either of the other options — as she did in this case — the process becomes governed by § 8-107 (a) and (b). Subsection (a) gives the personal representative three choices — one implict, two explicit. The implicit choice, of course, is to allow the claim in its entirety. If he chooses not to do that, he must notify the claimant either (1) that the claim is disallowed in whole or in a stated amount, or (2) that he will petition the orphans' court to determine whether the claim should be allowed. If the personal representative disallows the claim directly, as he did here, subsection (b) becomes operative. That indeed is the critical provision. It states, in relevant part:

> "If the claim is disallowed in whole or in a stated amount, the claimant is forever barred to the extent of the disallowance *unless he files a petition for allowance in the [orphans'] court or* commences an action against the personal representative or against one or more of the persons to whom property has been distributed." (Emphasis supplied.)

A significant change was made with the enactment of this section. Under former §§ 119 and 120 of art. 93, the creditor's only recourse upon disallowance of the claim by the personal representative was to "commence a suit for recovery" in the circuit court. Failure to "bring suit" upon the claim within six months after rejection by the personal representative barred the claim. No resort to the orphans' court was possible, for, as noted, the personal representative was not at all bound by the determination of that tribunal. If the one available recourse — an action in the circuit court — was not followed, the claim was extinguished and became absolutely unenforceable. Section 8-107 (b) provides another option, however. It expressly permits the creditor to petition the *orphans' court* for allowance of the claim, indicating a jurisdiction in that court not previously (at least since 1802) available. The draftsmen of the revised article appeared to recognize the change when they noted, in the Comment to § 8-107, *"[a]lthough the Court has the power to adjudicate the validity of the claim,* either party may request a jury trial and

thereby require the adjudication to be shifted to a law court." (Emphasis supplied.) This statement is, of course, diametrically contrary to the long established construction of the prior law.

The significance of this change is heightened by a subtle change made by ET, § 8-108. Former § 109 of art. 93 required an administrator to discharge all "just claims" within a specified period of time. In context, this meant claims that he had not chosen to disallow or claims required to be paid by virtue of judgments rendered in actions filed by creditors pursuant to §§ 119 and 120. It obviously did not require the payment of claims merely upon their allowance by the orphans' court. *Levering v. Levering, supra; Montgomery Co., Etc. v. Donnally, supra.*

In contrast, § 8-108 (a) provides, in relevant part:

"Upon the expiration of six months from the date of the first appointment of a personal representative, the personal representative *shall pay the claims allowed against the estate* in the order of priority prescribed in § 8-105.... A person *with a valid unbarred claim or* with a valid unbarred judgment who has not been paid may petition the [orphans'] court *for an order directing the personal representative to pay the claim* to the extent that funds of the estate are available for payment." (Emphasis supplied.)

Ample authority is provided to the court to enforce such an order. *See* ET, §§ 2-103 [7] and 7-403.[8]

It thus appears that the discretion provided in the Act of 1802 has been effectively eliminated. A creditor whose claim has been disallowed by the personal representative may litigate the issue in the orphans' court; and, if he chooses to

[7]. "The [orphans'] court has the same legal and equitable powers to effectuate its jurisdiction, punish contempts, and carry out its orders, judgments, and decrees as a court of record with general jurisdiction in equity."

[8]. The exercise of power in violation of an orphans' court order may constitute a breach of fiduciary duty rendering the personal representative personally liable to injured parties. *See also* § 8-109.

do so and is successful, the order of that tribunal is binding upon and enforceable against the personal representative. The deficiency in the authority of the orphans' court alluded to in *Levering* — that which effectuated its lack or loss of "jurisdiction" — has now been overcome. We therefore conclude that, in the circumstances of this case, the Orphans' Court of Anne Arundel County did have jurisdiction to consider and adjudicate the validity of Mrs. Heaphy's claim.[9] *See* 56 Op. Att'y Gen. 377 (1971).

## (2) *But Did It Reach The Right Decision?*

One hundred years ago, in the case of *Bantz v. Bantz,* 52 Md. 686, 694 (1880), the Court of Appeals laid down the following rule:

> "In order to justify a claim for services being allowed against the decedent, there must have been a design, at the time of the rendition, to charge, and an expectation on the part of the recipient to pay for the services. The services must have been of such a character, and rendered under such circumstances, as to fairly imply an understanding of payment, and a promise to pay. There must have been an express or implied understanding between the parties that a charge for the services was to be made, and to be met by payment. . . ."

Subsequently, in *Bixler v. Sellman,* 77 Md. 494, 496 (1893), the Court made clear that this rule applied "only when a claim

---

9. We see nothing in *Comptroller v. Russell,* 284 Md. 174 (1978), or *Blum v. Fox,* 173 Md. 527 (1938), cited by appellant, as requiring a different conclusion. In *Russell,* the Court reaffirmed the position it had taken nearly a century earlier in *Bonaparte v. State,* 63 Md. 465 (1885), and concluded that an orphans' court had no jurisdiction to adjudicate a dispute between the Comptroller of the Treasury and a personal representative over State income taxes allegedly owed by the decedent. But this rested solely upon the distinction drawn between taxes and "private" claims, and in no way suggested a lack of jurisdiction over the latter. *Blum v. Fox* was decided long before the 1969 statutory revisions and has no relevance to the question at hand.

Mrs. Heaphy's handwritten note to the Register of Wills, although not captioned as a *petition,* clearly was intended as such and will be given that effect.

of this character is made by a member of the family of the decedent, for, of course, it must be conceded that generally the law implies a promise to pay for services rendered and accepted; but a well recognized distinction exists where the service is rendered by a member of the family of the person served. *In the latter case a presumption of law arises that such services are gratuitous."* (Emphasis supplied.)

This rule, and the accompanying presumption, are still the law in Maryland. *See Keller v. Keller,* 257 Md. 522 (1970); *Jones v. Jones,* 146 Md. 19 (1924).

Notwithstanding appellee's suggestion to the contrary, we have little doubt that Mrs. Heaphy was a member of Mrs. Schaefer's "family," for purposes of the presumption stated in *Bixler.* She was Mrs. Schaefer's sister (which, cloning aside, is possibly the closest of biological relationships); moreover, she lived in the same household with Mrs. Schaefer for six years. She was not merely a boarder, as in *Jones v. Jones, supra.* Her sister's house was her home, her only home. *Compare Shaefer v. Hewes, Executor,* 225 Md. 207 (1961). The two of them together constituted the household, and together they made it operate. In that circumstance they most certainly satisfied the definition of "family" announced in *Jones v. Jones, supra,* 146 Md. at 25: "a collective body of persons who form one household, under one head and one domestic government, and who have reciprocal natural or moral duties to support and care for each other."

Once the family relationship is established and the presumption that the services were rendered gratuitously becomes operative, the courts have required very clear and convincing evidence in order to overcome the presumption. Quoting in part from *Burgess v. Burgess,* 109 Pa. St. 312, the Court said in *Bixler,* 77 Md. at 497, in the context of services performed by a granddaughter,

> "The vague testimony of witnesses as to the declarations of the decedent that he intended to pay or would see the appellant paid, cannot have that effect, when taken in connection with all the other facts of this case. As was said by the Supreme Court

of Pennsylvania, 'such a claim as this is pregnant with danger, as well to the rights of creditors, as to the other heirs, and cannot of course be entitled to countenance from the court, unless accompanied with clear proof of an agreement not depending upon idle and loose declarations, but on unequivocal acts — as for example, a settlement of an account, or money paid by the father to the son as wages, distinctly thereby manifesting that the relation which subsisted was not the ordinary one of parent and child, but master and servant.' "

*See also Keller v. Keller, supra,* 257 Md. 522; *Lowe v. Lowe,* 111 Md. 113 (1909); *Duckworth v. Duckworth,* 98 Md. 92 (1903).

It is with this very careful, if not jaundiced, eye that we look at the evidence adduced in support of Mrs. Heaphy's claim.

Mrs. Heaphy, a widow, originally moved into her sister's home in 1972 on a temporary basis, apparently as a "house sitter," when Mrs. Schaefer had to spend some time on the Eastern Shore following her husband's automobile accident. When Mrs. Schaefer returned home, however, she asked Mrs. Heaphy to remain with her. It is not entirely clear whether Mr. Schaefer ever returned or when he died, but the record does indicate that Mrs. Schaefer would otherwise have been alone in the house and wanted a companion. Until 1976, Mrs. Schaefer was able to get around, and the two sisters ran the household together. Mrs. Schaefer bought the groceries and the two shared the housework. Mrs. Heaphy contributed $10 a week toward the enterprise, but otherwise paid no room and board, although she apparently could have afforded to do so.[10]

Beginning some time in 1976 — the date is not clear — Mrs. Schaefer's health began to deteriorate more dramatically and Mrs. Heaphy started to take over more of the household chores. This included tending to her sister's personal needs on an increasingly frequent and constant basis.

---

10. The evidence showed that Mrs. Heaphy received an income from certain real estate owned by her.

Nowhere in the record, however, is there any evidence of a specific agreement to pay, or an expectation of receiving, any particular remuneration for these services. Over objection, Mrs. Heaphy testified about her sister wanting to give her a "strong box," but her testimony was most unclear, and all that really appears from it is that Mrs. Schaefer died before consummating any gift or other transaction regarding the "strong box." She also said that on one occasion, unspecified as to date, Mrs. Schaefer wrote a note and put $20.00 in it for Mrs. Heaphy; but neither the note nor its contents were revealed.

The most specific evidence offered by Mrs. Heaphy was (1) that her sister "always told me that you can stay here as long as you want to May, as long as Billy [Mrs. Schaefer's son and appellant here] has the house this is your home. . . ." and (2) "I just thought Billy would take care of me. I thought he would leave me his mother's stuff. . . ."

Mrs. Heaphy's daughter, Mrs. Lewis, stated that Mrs. Schaefer had told her that "if my mother hadn't taken care of her she would have had to sell everything and move into a nursing home which she did not want to do, so that by my mother staying there and taking care of her, that when she passed away she would see that she was taken care of." Mrs. Lewis also indicated that "there was something in writing, which we were never around to see. . . ."

Mr. Schaefer denied any such writings, and also denied that any promise had been made by his mother.

This evidence, in its most favorable light, falls way short of establishing the requisite agreement for compensation, the "master-servant" relationship. Vague promises to "take care of" Mrs. Heaphy simply do not suffice to overcome the presumption that Mrs. Heaphy acted gratuitously — with loving kindness and in discharge of her sororal obligation to her sick and dying sister — rather than with the expectation of being paid $150 a week. Even giving credence to Mrs. Heaphy's testimony, the court erred in allowing the claim for $2,000.

In light of this conclusion, it is unnecessary to consider

whether Mrs. Heaphy's testimony was rendered inadmissible or if she was rendered incompetent as a witness by the "Dead man's statute" (Courts article, § 9-116.)

*Order allowing claim for $2,000 reversed; appellee to pay the costs.*