# HENRIETTA BOGART *v.* LUTHER M. R. WILLIS

## ET AL., EXECUTORS.

### [No. 25, October Term, 1929.]

394

*Decided January 16th, 1930.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Charles G. Baldwin,* for the appellant.

*Hall Hammond,* for the appellees.

DIGGES, J., delivered the opinion of the Court.

The appeal in this case is from a judgment of the Superior Court of Baltmore City in a suit wherein the appellant was plaintiff and the appellees, executors of the last will and testament of John A. Calhoun, deceased, were defendants. The case was tried before the court sitting as a jury. At the close of the plaintiff's case the court instructed itself, sitting as a jury, that the plaintiff had offered no legally sufficient evidence entitling her to recover and its verdict must be for the defendant.

The facts out of which the controversy arises are: Henry A. Calhoun, a resident of Canada, died in 1912 leaving a last will and testament and codicils thereto, by the terms of which the plaintiff Henrietta Bogart was bequeathed an outright legacy of $15,000 and in addition thereto there was created a trust of $25,000, the income from which was to be paid to Henrietta Bogart so long as she lived, and after her death was to revert to the estate of Henry A. Calhoun and pass under the residuary clause of his will to John A. Calhoun. The trustees of this $25,000 were John A. Calhoun and Edmund G. Kaye, who were also named as executors in the will. John A. Calhoun and Henrietta Bogart were brother and sister, and nephew and niece respectively of Henry A. Calhoun, the testator. Shortly after the death of the testator, it appears that Edmund G. Kaye, one of the

executors and trustees, died; and from that time until July 11th, 1926, the date of the death of John A. Calhoun, he was the sole executor and trustee under his uncle's will. John A. Calhoun also left a will, of which the defendants herein were the executors, and by the provisions of which, after the payment of certain specific legacies, the whole of his estate, amounting to about $200,000, was devised and bequeathed to his widow for life, and after her death to be divided into two equal parts, one of which was devised to the children of his sister Henrietta Bogart, share and share alike, and the other of which was devised and bequeathed to the children of George F. Craig. The record discloses that after the death of John A. Calhoun there was considerable correspondence between his widow and his executors on one side, and the plaintiff and her attorneys on the other, beginning in August, 1926, and continuing until about the time of the institution of the suit, which was filed on July 3rd, 1928.

The declaration contained the money counts, and a special count setting forth that the defendants had qualified as executors of the last will and testament of John A. Calhoun, and had received all the property belonging to his estate, subject to the obligation to pay his debts, and further, that John A. Calhoun was at the time of his death indebted to the plaintiff in the full sum of $15,000, with interest from the 1st of July, 1926, and that there was more than sufficient property in the hands of the executors with which to pay said indebtedness, and also that they had stated an account showing more property than necessary to pay said debts. The defendants filed the general issue plea, and in addition a plea setting forth that they, after the death of John A. Calhoun, were informed of the claim of the plaintiff, that it was disputed and rejected by them in writing, and that the plaintiff did not, within nine months after the claim was rejected, bring suit thereon. There was an additional plea of three years limitation, which was withdrawn at the trial.

On July 31st, 1928, the plaintiff filed the account, with a double affidavit, one being made by herself and the other by her husband. The record also discloses that, since the death

of John A. Calhoun, Charles G. Baldwin has been duly appointed substitute trustee under the will of Henry A. Calhoun, in place of John A. Calhoun, deceased; and there is no dispute that the $25,000, constituting the trust fund under which Mrs. Bogart had a life estate, either has been or will be paid over to the substituted trustee by the executors of John A. Calhoun. The real dispute in the case is as to whether or not John A. Calhoun, at the time of his death, and therefore his executors now, are indebted to Henrietta Bogart in the sum of $15,000, the specific outright legacy bequeathed her by her uncle Henry A. Calhoun, with interest thereon from July 1st, 1926. The defendants by their pleas deny this indebtedness, and contend that the plaintiff has not established the debt by legal evidence. This contention was sustained by the lower court, as evidenced by the granting of the defendants' prayer.

Before passing upon the exceptions presented by the record, we feel constrained to call attention to the irregular and unsatisfactory state of the record in presenting the rulings of the lower court which we are called upon to review. Perhaps this is due to some extent to the fact that the case was tried before the court sitting as a jury, and for this reason the rulings were not as decisive and clean-cut as would have been the case had it been tried before a jury. Be this true or not, it presents a record in this court from which it is extremely difficult to determine the precise rulings covered by the exceptions. The depositions taken in Canada were read in open court, question and answer by question and answer, and during the reading of which the record does not disclose that there was any objection made to any of the testimony. At the close of this reading, the court, in what practically amounts to an opinion, covering more than two pages of the record, undertakes to state from his recollection all of the questions involved in the objections to testimony, and to summarize the rule in respect thereto, and concludes by saying: "The defendants then moved that the deposition of William Boyer be stricken out and that those parts of the deposition of the plaintiff which related to her transactions

(except contents of checks) or conversations with the defendants' decedent be stricken out, exceptions having been previously noted by defendants to their admission, and the court granted the motion of the defendants and struck out the depositions as aforesaid, and to the action of the court in granting this motion of the defendants the plaintiff excepted." Such a mode of ruling upon the admissibility of evidence and the exceptions thereto does not meet with the approval of this court. It requires us to go over this testimony and determine which of it was in fact objected to, and ruled out. This could only be done by exercising our discretion as to whether a given question and answer was in fact testimony as to a statement made by the deceased or as to a transaction had with the deceased, without any certainty that those in fact were the questions and answers to which objection had been interposed and sustained by the lower court. Such a procedure would be the exercise of original and not appellate jurisdiction by this court.

The plaintiff sought to establish her claim by putting in evidence the will of her uncle, Henry A. Calhoun; by an account with a double probate; by the testimony, taken under commission, of Thomas W. Boyer, the manager of the Royal Bank of Canada, at Edmonton, South Alberta; her own testimony, taken in the same way; and the testimony of Mr. Luther M. R. Willis given at the trial in Baltimore.

The witness Boyer produced fourteen deposit slips in connection with the account of the plaintiff in his bank, being account No. B-251. These deposit slips extended from January 16th, 1925, to June 5th, 1926. He explained that these deposit slips indicated that the proceeds, or part of the proceeds, of certain checks, each in the amount of $200, coming from the United States, had either been deposited in whole to the account of the plaintiff, or some portion of the check had been received in cash and the balance deposited. The witness further stated that he did not look after the deposits himself, except by checking them at the end of each day, which he did; that the only personal knowledge he had in the matter was that gained from checking the deposit slips

at the end of the day; that he neither received the deposits himself nor saw the money, checks, or drafts represented by the deposits, and that he had no knowledge of the source from which the money came. He also produced fourteen copies of these deposit slips and stated that the originals which he had previously produced were the property of the bank, which the bank did not allow out of its possession, and stated that he had compared the copies with the originals and found them to be true copies of the originals. He then offered to put in the copies as exhibits, which were marked "Exhibit No. 1" and attached to his deposition. This evidence was excluded by the trial court, upon objection by the defendants, and forms one of the exceptions in the record. In passing upon this point, the lower court said: "I know of no principle involved which permits the introduction of secondary evidence in cases of this sort. I do not know that copies have ever been permitted except in the case of public documents." The defendants contend this ruling to be correct, upon the authority of *Dick v. Biddle,* 105 Md. 308; *Stevens v. Northern Central Ry. Co.,* 129 Md. 215; *Cohen v. Bogatsky,* 149 Md. 134; and *Shockley v. Penna. R. Co.,* 109 Md. 123.

There can be no doubt that these authorities correctly state the general rule to be that copies of papers are not competent evidence. In the case of *Shockley v. Penna. R. Co., supra,* it was held, in an action against an intermediate carrier, to recover damages for its delay in the transportation of freight, that a memorandum showing the time of arrival of cars carrying the freight at certain points, which memorandum is a copy and not an original, is not admissible in evidence. To like effect might be cited many other decisions of this court. But here the witness did produce the original deposit slips, and his testimony was in respect to the originals. After completing his testimony, he produced the copies of these deposit slips and stated that he had compared them with the originals and found them to be correct; further stating that the originals were the property of the bank and could not be taken from its possession. The defendants were represented

at the taking of this testimony by counsel, who must have seen the originals of these deposit slips and had full opportunity to compare the copies with the originals. Under these peculiar circumstances, we think there was error in rejecting the copies offered at the trial; and also error in striking out the testimony of Boyer, which was not based on the copies but on the original deposit slips. One of the reasons for the rule excluding secondary evidence in cases of this kind is the possibility of error in the transcription, or in other words, because it is not the best evidence of the fact sought to be shown by the paper; but, under the circumstances surrounding this case, we cannot see any difference between it and a case where a witness had appeared before the trial court with the original deposit slips, and, after testifying in respect to the originals, had left copies in order that he might take the originals away, the adverse party having full opportunity to verify the accuracy of the copies. And again, as stated, the witness did not testify from the copies, or in respect to the copies, but from the originals.

It is also to be borne in mind that notice had been given to the defendants to produce the checks, the deposit of which these represented, and these checks were not produced. This witness was the manager of the bank, and testified that these deposit slips were made in the usual course of business by employees of the bank, or depositors, and were checked over by him at the end of each day's business, comparing them with the records of the bank. We think, under such circumstances, even though he did not make out the deposit slips himself, he is competent to testify to the meaning of notations appearing on the slips. The contention of the plaintiff is that her brother, John A. Calhoun, up until the time of his death, sent her a check each month for $200, which is six per cent. on $40,000, the amount of the trust fund and the specific legacy bequeathed her by her uncle, and which she claims was in the hands of her brother, the executor of her uncle's will, at the time of her brother's death; and, she being disqualified to testify as to statements made by or transactions had with the deceased, she was attempting to

show by other testimony that there was deposited to her account each month a check for $200, drawn by a person in the United States.

In respect to the contention that the double probate of the account is *prima facie* evidence of the claim therein stated, the lower court took the view that, because one of the parties who made the affidavit was the plaintiff, who was seeking to recover the amount from a decedent's estate (she being disqualified, under section 3 of article 35 of the Code, to testify as to any statement made by the deceased, or concerning any transaction had with the deceased in respect to the matter in controversy), the probate was not in effect and substance a double probate. We are unable to sanction this view. Section 93 of article 93, concerning proofs of claims against a decedent's estate which an administrator may discharge without risk to himself, provides: "The vouchers or proofs of any claim on open account shall be a certificate of an oath taken by the creditor since the death, endorsed on or annexed to the account, that 'the account as stated is just and true, and that he hath not received any part of the money stated to be due, or any security or satisfaction for the same, except what (if any) is credited'; and moreover, the account shall appear to have been proved as open accounts are required to be proved by article 35, title 'Evidence.'" And section 51 of article 35, title "Evidence," under "Proof of Accounts," provides: "The oath of any disinterested credible witness, taken before any judge or justice of the peace of this State, or before any officer of the State or county where such witness may be at the time, having authority to administer an oath therein, and certified as aforesaid, proving the payment or delivery of any money * * * shall be legal evidence in any court or before any justice of the peace of this State to charge the person to whom such money * * * shall be so proved to be delivered * * *; provided, the party bringing suit for such money * * * shall, on or before the first day of the trial term of the court, make oath as aforesaid before some judge or justice of the peace of this State, or before some officer of the state or country where he may be at the time, having

authority to administer an oath therein, and certified as aforesaid, that he believes the money, goods, merchandise, effects or chattels charged in the account to which such oath shall be annexed, were *bona fide* delivered as charged * * * and that he hath not, to his knowledge or belief, received any payment or satisfaction * * * more than credit is duly given for in and appearing upon said account, nor hath he received any security for the same, and that the amount charged and claimed is justly due, according to the best of his knowledge and belief."

It seems clear from a reading of these two sections, the first of which deals specifically with the proof of claims against a decedent's estate, that the creditor or person suing is competent, and is one of the necessary parties, to make this affidavit, which, together with the affidavit of a disinterested credible witness, constitutes what is generally spoken of as the double probate; and it follows, therefore, in our opinion, that the plaintiff here was not disqualified to make such an affidavit. The real question, however, on this point is: What effect does the double probate have? In *Jackson v. West*, 22 Md. 82, it was said: "First, as to the proof of the account. This consists of the oath of William B. Jackson, one of the firm of Jackson Brothers & Company, and also the oath of Joseph C. Jackson, a disinterested credible witness, the clerk and bookkeeper of the appellants, made and certified according to the requirement of the fourth section of the Act of 1785, chapter 46. This is sufficient *prima facie* proof to establish the account according to the practice in this State. *Strike v. McDonald*, 2 H. & G. 234; *Maccubbin v. Cromwell*, 2 H. & G. 458; *Alexander's Chanc. Prac.*, 132."

That was a case where a petition had been filed in a trust estate and the property was about to be distributed, the trust having terminated, by a creditor praying the allowance of an account for necessities which had been furnished the life tenant, and which account was authenticated in the method prescribed by section 51 of article 35 of the Code. The court, after holding that the probate of the account was suffi-

cient *prima facie* proof thereof, went on to say: "But if the exceptions filed against this claim are to be considered as requiring *full proof*, we think the evidence taken under the commission has supplied as full proof as such a claim is ordinarily susceptible of."

In the case of *Strike v. McDonald, supra,* being a creditor's bill, wherein the account was authenticated in the manner prescribed by the Code, in dealing with this question Chancellor Bland said: "With regard to the proof of claims brought in by other creditors, it has been the practice, in cases of deceased persons' estates, to require no higher proof than such as would induce the orphans' court to allow the claim according to the testamentary system, in case it were paid by the executor and administrator and no objections were made. * * * In cases of insolvency, under the acts of assembly which formerly referred such matters to the chancellor, it was the practice to consider the insolvent's schedule, or his voluntary admission, as sufficient evidence of the debt; or if the insolvent was dead, then such proof as was admitted to sustain claims against deceased persons' estates. But if the insolvent denied the debt, or there was any discrepancy between his schedule or admission and the creditor's claim, then the creditor was put to full proof."

And in *Maccubbin v. Cromwell, supra,* "The funds were in a court of chancery and Cromwell prayed to have a part of those funds applied to the discharge of his claim. It has long been the uniform practice in the court of chancery in this State in applications of this kind to receive the papers on which the claim is founded as *prima facie* evidence, and the chancellor will act on them accordingly, unless the testimony is put in issue, and full proof is required by the opposite party. This practice is founded in convenience and to save expense to suitors in that court, and ought not to be disregarded by us. Who is to be injured by it? It does not deprive the party of his right to have full proof, if he thinks proper to demand it."

And again, in *Allender v. Trinity Church,* 3 Gill, 172, re-affirmed in *Kent v. Waters,* 18 Md. 53, it was said: "It

has also been urged that the county court were right in rejecting the appellant's claim because it was not authenticated in the mode prescribed by our testamentary system for claims exhibited against the estates of deceased persons. This objection detracts nothing from the appellant's right to recover. The appellees, by their answer, called upon the appellants for full proof of their claim; and this requisition *per se* would have dispensed with the ordinary precautionary proofs of their claim prescribed by our testamentary system, had it been made against the estate of a deceased person. What object could a claimant have in exhibiting primary proofs of his claim, when they would be wholly inadmissible evidence to sustain it, when full proof is required? Primary proofs stand in the place of full proof until full proof is demanded. From that moment they cease to be any evidence in the case, and there no longer exists any necessity for their production.."

In all cases where the claim is denied, as has been done in this case by the defendants filing the general issue plea and contesting the validity of the claim, full proof is demanded and required; and the proof afforded by the double probate, variously expressed as primary or precautionary, which would be sufficient warrant for the payment of the claim by an executor or other person distributing a fund without contest, loses its efficacy as proof and leaves the plaintiff, so far as the obligation to fully prove his claim, in the same position as if no double probate had been attached to the account. In our opinion the double probate of the account filed in this case, after contest, is not evidence of the plaintiff's claim. We think this view is the proper interpretation of the statutes involved, and is fully sustained by the cases in this court above cited.

In view of the state of the record presenting the rulings of the court on the testimony given by the plaintiff, we cannot say what specific questions and answers of this witness were objected to and ruled out, and the only comment we feel at liberty to make is that, under the provisions of section 3 of article 35, the plaintiff should not be allowed to testify as to

any transaction had with or statement made by the deceased relative to the matter in controversy. The interpretation and purpose of this section has been so frequently passed upon by this court that we do not deem it necessary to do more than refer to the citations on this point, collected in the note following this section in the Code.

The third, fourth, fifth, sixth, seventh and eighth exceptions were reserved to the action of the court in sustaining objections to questions propounded by the plaintiff to the witness Willis. All of these questions either required the opinion of the witness as to his construction of the meaning of certain language used in the correspondence, or required him to divulge information which he had acquired from the deceased while acting as his attorney. We find no error in these rulings.

When we come to consider the admissibility of the correspondence subsequent to the death of John A. Calhoun, between the executors of his will and the plaintiff and her attorney, it is again difficult to determine from the record which, if any, were permitted to remain in the record, and if so, for what purpose, because we find them admitted at one stage of the proceedings as evidence of the removal of the bar of the three-year limitation, and then, after the pleas were amended by excluding that plea, a ruling was made excluding the letters which had previously been admitted. This ruling seems to have applied to the correspondence prior to January 7th, 1927. At the end of the testimony, all correspondence from and after January 7th, 1927, was admitted, "for the purpose of whatever light it might shed upon the last plea of the defendants that the suit was not brought within nine months after the rejection by the executors," and the court added: "If there are any letters from which the jury may find that all three of the executors acknowledged the indebtedness or acknowledged that Mr. Calhoun had owed at any time to his sister $15,000, I will let these in. But I don't know of any."

The fifth plea of the defendants invoked the bar contained in section 110 of article 93 of the Code, which provides:

"If a claim shall be asserted against or exhibited to an administrator or executor in any form, whether sworn to or passed by the orphans' court or not, and he shall refuse payment thereof in writing, such claim shall be forever barred unless the creditor shall bring suit upon the same within nine months after such rejection." This section is not a statute of limitations which may be waived, but is a statutory bar, the effect of which is to prevent the collection of a claim against a decedent's estate, exhibited to or asserted against the administrator or executor, when the payment thereof is refused in writing, unless the creditor shall bring suit on such claim within nine months after such rejection. *Zollickoffer v. Seth,* 44 Md. 359, at page 374; *Coburn v. Harris,* 53 Md. 371; *Coburn v. Harris,* 58 Md. 104; *Maryland Casualty Co. v. State,* 137 Md. 154; *Marden v. Scott,* 154 Md. 429.

The evidence of the rejection in writing of the claim here sued on is the letter of Mr. Willis to the plaintiff dated September 9th, 1926, in which the absolute legacy of $15,000 under the will of Henry A. Calhoun is acknowledged, but the creation of the trust of $25,000 is denied. Whether this or any other letter written to the plaintiff or her attorney could be construed as a compliance with the provisions of section 110 of article 93 is of no consequence, for the reason that on January 14th, 1927, the attorney for the plaintiff received the following letter:

"Yours of the 7th enclosing statement of the claim of Mrs. H. A. Bogart against the estate of John A. Calhoun is before me, upon my return to the city this morning. I wish to state that the executors of Mr. Calhoun's estate are prepared to admit your client's claim.

"(Signed) Luther M. R. Willis,
"For himself and co-executors, estate of John A. Calhoun."

Upon the receipt of this letter the plaintiff was made aware (in writing) of a change in the position taken by the executors relative to her claim and it had the effect of cancelling

any former rejection, even though the previous letter could be properly construed to contain such a rejection as provided for by section 110 of article 93 of the Code; and it follows that, before the bar provided for by the statute could be invoked, it was necessary to reject, in the manner provided by the statute, the plaintiff's claim at a date subsequent to January 14th, 1927. Any other construction would permit a defendant to play fast and loose, and claim the benefits of the statute while at the same time leading the plaintiff to believe that he proposed to pay the claim.

We have found no case of a suit against an estate where the facts were at all similar to the one at bar, the questions generally arising in an attempt to collect claims against an estate for services rendered, work done, or materials furnished the decedent. In the case now under consideration there can be no doubt that the plaintiff has established that, under the will of her uncle, Henry A. Calhoun, she was entitled to receive from his estate an absolute legacy of $15,000, and, in addition, the income for life from a trust fund of $25,000. From shortly after the death of her uncle, her brother John A. Calhoun was the sole surviving executor and trustee of her uncle's will. There is no dispute that Henry A. Calhoun's estate was sufficient to pay these legacies, and the obligation imposed by law upon John A. Calhoun as such executor was to carry out the provisions of his uncle's will by paying the absolute legacy and the income on the trust fund of $25,000. After the death of John A. Calhoun, his executors, the defendants and appellees here, admit that the plaintiff is entitled to the income for life from $25,000, and agree to turn this amount over to the substituted trustee, but they deny that the estate of John A. Calhoun owes the plaintiff the absolute legacy of $15,000, and to sustain this position rely upon the inability of the plaintiff, by reason of her disqualification as a witness, to prove that she has not been paid. The plaintiff has therefore brought suit for $15,000 and has submitted sufficient proof to take the case to the jury and place upon John A. Calhoun, the appellees' decedent, the obligation of producing evidence showing he had either

paid her that sum or made some arrangement by which she released him from its payment. This being the obligation which the law imposed upon John A. Calhoun, in our opinion it should, and now does, rest upon the legal representatives of his estate. Any other view would be equivalent to saying that when an executor, whose duty it is to pay a legacy, before doing so dies, the legatee cannot collect the same because she is disqualified to testify to the fact that she has not been paid. Justice and fair dealing do not permit such a situation. On the other hand, no hardship is imposed on the defendants in this case, for the reason that if the legacy has been paid, they should have in their possession evidence of that fact.

Nothing which we have said is intended to impugn the integrity, devotion, and loyalty of John A. Calhoun to his sister, and his ever watchful regard for her and her children's interest. This record amply demonstrates that fact. John A. Calhoun, on May 3rd, 1924, wrote to the appellant as follows:

"My Dear Sister: You will recollect by the terms of Uncle Henry's will that the $25,000.00 left in trust with me for you was, in the event you predeceased me, to revert back to my estate. I discussed this matter with my attorney, and in view of the fact that I wish you and your children to get the benefit of this, I have decided to draw up a new trust, copy of which is enclosed, as in so doing there will be no question about succession duty in the event that I should die before you. My attorney advises me that the contract which you hold, and signed by me, should be returned, as this inclosed document amply takes care of your interest, and two documents of similar tenor might cause confusion. As long as I live this document will have no effect on your present allowance, as the dividend of these bonds I placed to the credit of my account just as if they were in my possession. In the event that you wish any further information on this matter I will be glad to answer your questions. I thank you to return the other document and register it so that it

will be sure to reach me. With kind regards to all. Yours sincerely, Jno. A. Calhoun."

The new trust, a copy of which was enclosed with this letter, provided:

"Know all men by these presents, that I, John A. Calhoun, of the City of Baltimore, in the State of Maryland, one of the United States of America, for and in consideration of the sum of one dollar of lawful money of Canada to me in hand well and truly paid at or before the sealing and delivery of these presents by The Royal Trust Company, a trust company duly incorporated under the laws of the Dominion of Canada (the receipt whereof is hereby acknowledged) and of other good and valuable consideration me thereunto moving, have granted, sold, delivered, released and transferred unto the said The Royal Trust Company, its successors and assigns, all the personal property and securities described in the schedule annexed hereto marked 'A', together with such other personal property and securities as the said John A. Calhoun may from time to time deliver to the said The Royal Trust Company in addition to the said personal property and securities hereinbefore mentioned. To Have and to Hold the said personal property and securities unto and to the use of the said The Royal Trust Company, its successors and assigns, in trust nevertheless for the uses, persons and purposes and with the power following, that is to say: To hold the said estate and property hereby granted and to collect the income thereof, and after paying thereout all necessary and proper costs, charges and expenses, including the usual fees for the services of the said The Royal Trust Company as Trustee as aforesaid, to pay over the net income thereof to me for and during my natural life for my sole use, benefit and behoof in equal quarterly payments to be deposited in the Bank of Nova Scotia, in the City of Saint John, in the County of the City and County of Saint John, and Province of New Brunswick; and from and after my

death to pay over the net income of the said estate to Henrietta A. Bogart, of Tompkins, in the Province of Saskatchewan, in the Dominion of Canada, married woman, during the term of her natural life in equal quarterly payments, and on her death or in the event of her predeceasing me from and after the day of the date of my death to divide the net income of said estate among the children of the said Henrietta A. Bogart, in equal quarterly payments and in equal shares until the youngest child of the said Henrietta A. Bogart shall arrive at the age of twenty-one years, the child or children of any deceased child to take such share of said income as their, his or her parent would have taken if living and when and so soon as the youngest child of the said Henrietta A. Bogart shall attain the age of twenty-one years then in trust to divide the principal sum of the estate hereby granted, transferred and conveyed and any accumulation thereof among the children of the said Henrietta A. Bogart in equal shares, the child or children of any deceased child to take such share as their, his or her parent would have been entitled to if living. That during my lifetime the said The Royal Trust Company shall not change, alter or vary any of the securities which it holds in trust; but from and after my decease any change in investment if necessary might be converted only into what are technically known as trust investments.

"In witness whereof I, said John A. Calhoun, have hereunto set my hand and seal this 18th day of April, 1924.

"John A. Calhoun.

"Signed, sealed and delivered in the presence of Luther M. R. Willis, William H. Gisin.

"Schedule A.

Municipality of City and County of Saint
John four per cent. bonds, due May 1st,
1952. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   $1,500.00
4 per cent. bonds, due 1st July, 1952. . . . .   7,750.00

Town of Sackville:
  5 per cent. debentures, due 31st December, 1941. . . . . . . . . . . . . . . . . . . . . . . . 1,500.00
  5 per cent. park debentures, due 31st December, 1941. . . . . . . . . . . . . . . . . . . 1,000.00
  5 per cent. water and sewerage debentures, due 31st December, 1941 . . . . . . 500.00

City of Saint John:
  4 per cent. bonds, due 1st November, 1929. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,000.00
  4 per cent. bonds, due 1st May, 1932. . . 500.00

City of Moncton:
  4 per cent. bonds, due 2nd July, 1943. . 4,000.00
                                            ──────────
      Total. . . . . . . . . . . . . . . . . . . . . . . . . . $17,750.00
  In stock of Wm. D. Gill and Son, Inc.. . . 7,250.
                                            ──────────
                                            $25,000.00"

Schedule A was typewritten with the exception of "In stock of Wm. D. Gill & Son, Inc., $7,250.00; $25,000.00," the above-quoted portion being in the handwriting of John A. Calhoun. The original of this declaration of trust was sent to the Royal Trust Company, which was named trustee therein, and the schedule attached to the original included only the typewritten portion of the schedule sent to the appellant. That portion of the schedule received by the appellant which was in the handwriting of John A. Calhoun was not on the schedule accompanying and made a part of the declaration of trust sent to the Royal Trust Company, the trustee; and the amount of the securities actually received by the trustee was $17,750.

The question is whether or not the declaration of trust of April 18th, 1924, under which the sum of $17,750 was placed in the hands of the Royal Trust Company as trustee, and by the terms of which John A. Calhoun was to receive the income during his life, and after his death to go to the plaintiff for life, with remainder to her children, was a substitute,

with the knowledge and consent of the plaintiff, for the $15,000 outright legacy. To be a settlement of her legacy, it must have been created out of her funds, with her knowledge and consent; and we think the evidence adduced by her is sufficient to compel the defendants to show that such was the case. There was error in granting the defendants' prayer, for which the judgment must be reversed, and a new trial awarded.

*Judgment reversed and new trial awarded, with costs to the appellant.*