617 A.2d 1142

**Patricia M. LAMPTON**

v.

**Thomas G. LaHOOD, Personal Representative
of the Estate of Terri Lea Hackett.**

**No. 418, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Jan. 8, 1993.

462

Monica M. Haley–Pierson (William C. Brennan, Jr., Knight, Manzi, Brennan, Ostrom & Ham, P.A., on the brief), Upper Marlboro, for appellant.

Thomas G. LaHood, Waldorf, for appellee.

Argued before BISHOP, CATHELL and MOTZ, JJ.

MOTZ, Judge.

This case involves a number of questions concerning the rights of creditors of a decedent and the duties of a personal representative of the decedent to those creditors, which were in the first instance resolved by the Orphans' Court for Charles County.

(i)

The decedent, Terri Lea Hackett, died on May 31, 1989; appellee Thomas G. LaHood was appointed the personal representative of her Estate on July 24, 1989.

At the time of her death Mrs. Hackett and her husband (from whom she was then separated) each owned an undivided one-half interest in a condominium in South Carolina. On November 14, 1986, they had executed a note, secured by a mortgage, to appellant, Patricia M. Lampton, in the principal amount of $70,900 with 7% interest per annum. On August 14 or 15, 1989, LaHood called Frank H. DuRant, a South Carolina attorney, to inquire as to the value of the condominium, the amount to be paid on the mortgage, and whether ancillary estate administration in South Carolina was necessary. Apparently, LaHood called DuRant because DuRant's name "was all over the [condominium] documents" since DuRant had acted as Lampton's attorney when the Hacketts executed the note and mortgage to her. Both DuRant and LaHood testified as to this pivotal telephone call.

DuRant testified that he told LaHood that the present value of the condominium was $55,000 to $60,000, that the approximate balance on the note was $73,000 or $74,000, that payments were delinquent, with the entire balance due in November, 1991, and that ancillary administration in South Carolina was necessary. According to DuRant, La-Hood then asked:

would I be willing to assist him in doing an ancillary administration. I inquired then as [to] what I needed to do to protect Ms. Lampton's interests in the estate filing in Maryland, specifically was there a necessity that I file any claim with the Maryland courts.... was it necessary for me to file a claim to protect my client's interests under her note and mortgage.

To this inquiry, DuRant testified, LaHood replied

that he was the personal representative of the estate and it was not necessary for me to do any filing because he

was aware of the claim and I was a known scheduled creditor ... And it would be paid.

On cross-examination, DuRant testified that he was certain that LaHood had told him in August, 1989, that he need not file a claim for Lampton and that he, DuRant, felt entitled to rely on this assurance from LaHood because: (1) LaHood specifically so stated in their first telephone conversation; (2) LaHood "did not stand to benefit or suffer detriment" by what he told DuRant; and (3) LaHood, as a "member of the Maryland bar and ... the personal representative of this estate, ... [had] a fiduciary duty to the creditors as well as the beneficiaries."

LaHood remembered "little" of this conversation; he could not and did not directly dispute DuRant's version of it. Rather, LaHood's "best" recollection of the conversation confirmed its substance:

We talked about the Tulsa case, which had been a recent Supreme Court case that had language about the appeal [sic] as a responsibility to ascertain creditors and to give notice to known creditors, give notice of the estate.

My best recollection is we had talked about the Tulsa case and Mr. DuRant said, well, I'm a known creditor and I don't need to file a claim. I may have said, yeah, okay, you may be right. That's my best recollection.

LaHood sent DuRant a letter dated August 17, 1989, confirming his request that DuRant act for the Estate in South Carolina. DuRant testified that, when he became aware that there might be a "potential conflict with respect to the estate" because the Hackett family "could not get together" with Lampton as to payment and so she might have a deficiency judgment against the Estate, he made LaHood aware of this and notified LaHood in a letter dated November 1, 1989, that "[d]ue to possible conflict of interest" he could not act for the Estate. DuRant also testified that he had numerous telephone conversations with members of the Hackett family and their representatives, including LaHood, "concerning a resolution of this problem." There are a number of letters, which were introduced as

exhibits in the Orphans' Court, that evidence this discussion of "the problem." It is undisputed that, no later than August 15, 1989, LaHood had actual knowledge that Lampton held the note and mortgage and that the mortgage probably did not fully secure the note, so Lampton had a potential, indeed probable, claim against the Estate. No correspondence or any other writing evidences either LaHood's representations that this claim need not be filed against the Estate or DuRant's understanding of LaHood's representations. As late as September 6, 1990, however, LaHood in correspondence, not to DuRant or Lampton but to a trustee of the decedent's children, acknowledged that the "Estate and Mr. Hackett [will] be responsible for any deficiency on the Lampton note."

DuRant filed suit on August 27, 1990, in South Carolina on behalf of Lampton against Mr. Hackett and LaHood, as personal representative of the Estate, to recover amounts owed on the note. LaHood never answered or responded to the suit. On January 18, 1991, Lampton obtained a judgment against both defendants, jointly and severally, for $90,831.97 and an order that the property be sold. On January 22, 1991, LaHood filed a non-resident South Carolina estate tax return for the Estate listing one half of the mortgage on the condominium as an obligation of the Estate.

When the Estate had made no response to the South Carolina judgment, on May 21, 1991, Lampton filed a claim against the Estate for $90,831.97 and interest from January 1991. On May 29, 1991, LaHood filed and mailed to Lampton a Notice of Disallowance of her claim. On July 15, 1991, Lampton filed a petition in the Orphans' Court for Charles County[1] to allow her claim and to order LaHood

---

1. The jurisdiction of the Orphans' Court is unchallenged by LaHood and was in all events proper pursuant to Md.Code (1974, 1991 Repl. Vol., 1992 Cum.Supp.) § 8-108(a) of the Estates and Trusts Article. *See Schaefer v. Heaphy,* 45 Md.App. 144, 151-154, 412 A.2d 107 (1980). (All statutory references herein are to the Estates and Trusts Article unless expressly indicated to the contrary).

"to personally account" to her "for his failure to properly administer" the Estate. After a hearing, the Orphans' Court issued a written one sentence order that the "Petition for Allowance of Claim is hereby denied." Lampton took a direct appeal from that disallowance to this Court. *See* Md.Cts. & Jud. Proceedings Proc.Code Ann. § 12–501 (1974, 1989 Repl.Vol.).

On appeal, Lampton asserts:

1. Appellant Lampton timely filed her claim with the personal representative directly, pursuant to Section 8–104(b) of the Estates and Trusts Article of the Annotated Code of Maryland.

2. Due process requires that the personal representative give "actual notice" to known, scheduled creditors of the decedent of non-claim filing statutes.

3. The personal representative is estopped from relying on time limitations contained in the statute when he did not himself comply with the statute.

4. The personal representative is estopped from relying on time limitations contained in the statute because of appellant's justifiable reliance on the personal representative's assurances and actions.

5. The personal representative is personally accountable to appellant Lampton for his failure to properly administer the estate.

### (ii)

The gist of Lampton's first argument is that she filed her claim against the Estate by timely providing the personal representative, LaHood, with actual knowledge of the claim.

Maryland law provides three ways in which "claims against an estate of a decedent may be presented." § 8–104(a) of the Estates & Trusts Article. Within the appropriate statutory time period, a creditor must: (1) deliver a verified, written statement of the claim to the personal representative pursuant to § 8–104(b); (2) file the claim with the register in the correct county, pursuant to § 8–

104(c); or (3) if a cause of action survives death, commence an action on any person to whom property has been distributed, pursuant to § 8–104(d). *See Lowery v. Hairston*, 73 Md.App. 189, 197, 533 A.2d 922 (1987). Here it is conceded that the appropriate statutory period is "within nine months of the date of death;"[2] the date of death was May 31, 1989, so creditor's claims had to be filed by February 28, 1990. Further, it is conceded that no claim was filed with the register or suit commenced during this period; thus, the methods described in § 8–104(c) and § 8–104(d) were not employed here.

■ Lampton asserts, however, that she "substantially complied" with § 8–104(b) by timely, albeit verbally, providing the personal representative, LaHood, with "actual knowledge" of her claim. Section 8–104(b) provides:

> The claimant may deliver or mail to the personal representative *a verified written statement* of the claim indicating its basis, the name and address of the claimant, and the amount claimed. If the claim is not yet due, the date when it will become due shall be stated. If the claim is contingent, the nature of the contingency shall be stated. If the claim is secured, the security shall be described. The failure of the claimant to comply with the provisions of this section or with the reasonable requests of the personal representative for additional information may be a basis for disallowance of a claim in the discretion of the court.

(emphasis added).

Lampton acknowledges that she did not provide the personal representative, LaHood, with a "verified written statement" of her claim, as required by § 8–104(b), but she argues that she, nevertheless, substantially complied with

---

**2.** An amendment to § 8–103(a)(1) has subsequently changed the statutory limitation period to six months from the date of the decedent's death. This amendment did not "take effect" until October 1, 1992, thus governing the "estates persons dying on or after October 1, 1992," and so is not applicable to this case. *See* 1992 Md.Laws, Ch. 226, § 2.

§ 8–104(b) by verbally providing LaHood with all of the information necessary to state her claim. Furthermore, Lampton argues that LaHood "by his own admissions and correspondence, and his later actions, ... had all the information" so that there was "no need" for her to submit a "verified written statement" of her claim. LaHood does not assert that he was without timely, actual knowledge of all of the particulars of Lampton's claim; LaHood simply maintains that this makes no difference and the verbal communications by Lampton's lawyer do not constitute a statement of her claim in compliance with § 8–104(b).

The sole authority cited by Lampton in support of her argument is *Lowery v. Hairston, supra.* There, plaintiffs filed an action against the personal representative of an estate seeking specific performance of a real estate purchase option. The circuit court dismissed the action, finding that the option constituted a "claim" under § 8–103(a) and that the plaintiffs had failed to file the claim in a timely fashion. We reversed, holding that three *letters* from the plaintiffs to the personal representative, which were sent and received by him prior to the statutory deadline for claims, and in which were stated the names and addresses of the claimants, the terms of the option, and their intent and ability to exercise it, constituted substantial and timely compliance with the statute. This holding is, as we noted then, entirely consistent with the "use of the word 'may' throughout § 8–104," indicating that the forms of presentment are "permissive and not mandatory in nature." 73 Md.App. at 197 n. 2, 533 A.2d 922. The view that substantial, rather than strict compliance, is all that is necessary, has also been adopted by other courts interpreting similar statutes. *See e.g., Peterson v. Marston,* 362 N.W.2d 309 (Minn.1985); *Quinn v. Quinn,* 772 P.2d 979, 981 (Utah App.1989); *Strong Bros. Enterprises, Inc. v. Estate of Strong,* 666 P.2d 1109 (Colo.App.1983). *See also Matter of Estate of Phillips,* 532 A.2d 654 (D.C.App.1987).

To permit substantial compliance with these kinds of statutory requirements, does not, however, sanction the

elimination of such requirements altogether. There must still be compliance with the statute, indeed there must be "substantial compliance" with it. Lampton does not cite any case, from any jurisdiction, in which a court has held that in the absence of some writing—whether it be a formal claim, or a letter, or a memorandum, or a lawsuit—a claimant has been held to have substantially complied with a claims notice statute like § 8–104. In *Lowery* and all of the out-of-state cases cited above, the claimant timely notified the personal representative of the claim by a *writing* of some kind.

The Maryland appellate courts have never directly addressed the question of whether a claimant complies with § 8–104 simply by providing a personal representative with "actual knowledge" of a claim within the statutory time period. In *Campbell v. Welsh,* 54 Md.App. 614, 460 A.2d 76, *cert. denied,* 297 Md. 108 (1983), however, we did implicitly reject such an argument. There the decedent's son filed suit in circuit court for specific performance for the sale of certain land owned by his mother and for "such other and general relief as ... may appear ... proper." 54 Md.App. at 616, 460 A.2d 76. The son did not add an alternative claim for money damages until well after the expiration of the statutory time limit. *Id.* We held that the alleged agreement between the son and his mother for the sale of land was not enforceable because of the Statute of Frauds and then concluded that his alternative claim for money damages was barred because it was not filed within the statutory period. That holding is relevant here because the son, himself, was the personal representative during six weeks of the statutory period. 54 Md.App. at 624, 460 A.2d 76. Presumably, he had actual knowledge, at that time, of his alternative claim for money damages and, indeed, intended to assert such a claim by requesting "other relief" as may be "proper." Our holding that the son had to file timely a written claim (or suit) actually asserting the right to money damages is, thus, a *sub silentio* rejection of the argument that imparting actual knowledge to the personal

representative is "enough" or that the personal representative's actual knowledge of a claim eliminates the need for any further claim by the creditor.

Those jurisdictions that have considered the question have, for the most part, similarly rejected the view that actual knowledge of a claim by the personal representative eliminates a creditor's statutory obligation to file a timely written claim. *See e.g., Harter v. Lenmark,* 443 N.W.2d 537 (Minn.1989); *In re Estate of Masopust,* 232 Neb. 936, 443 N.W.2d 274 (1989); *In re Estate of Feuerhelm,* 215 Neb. 872, 341 N.W.2d 342 (1983); *Nathanson v. Superior Court of Los Angeles County,* 12 Cal.3d 355, 115 Cal.Rptr. 783, 789, 525 P.2d 687, 693 (1974). As the Supreme Court of Nebraska explained:

> Mere notice to a representative of an estate regarding a possible demand or claim against an estate does not constitute presenting or filing a claim under [the relevant statute]. If notice were accorded the stature of a claim, the resultant state of flux and uncertainty would frustrate and void the purpose and objectives of the nonclaim statute.

*In re Estate of Feuerhelm, supra,* 341 N.W.2d at 345.

The only exception to the general view that imparting actual, verbal notice of a claim to the personal representative does not eliminate the need to file a timely, written claim in order to prevail against an estate is found in the New Hampshire cases. The relevant New Hampshire statute permits a claimant to notify an estate of a claim by registered mail but does not require that the notice be written. N.H.Rev.Stat.Ann. § 556:2 (1955). In a long line of cases, New Hampshire courts have interpreted this statute to mean that notice of a creditor's claim "may be oral or written or a combination of both." *Lunderville v. Morse,* 112 N.H. 6, 287 A.2d 612, 613 (1972); *Frost v. Frost,* 125 A.2d 656, 657 (N.H.1956); *Watson v. Carvelle,* 82 N.H. 453, 136 A. 126 (1926). Not only does Maryland have no similar well established case law but § 8–103, unlike the New Hampshire statute but like the relevant probate statutes of

most states, specifically provides that a claimant is to present his claim by making a "written" statement. Indeed, Maryland provides, as many states do not, that the "written statement" be "verified." [3] This is clearly an indication that the General Assembly did not contemplate that oral statements of claims could satisfy the statutory requirements.

### (iii)

■ The second argument posed by Lampton is that due process requires that a personal representative give actual notice to known creditors of the decedent and, since LaHood failed to give this notice to her, LaHood cannot deny her claim. Lampton bases this argument on *Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988).

In *Tulsa*, the Supreme Court held that the claim of a known creditor of an estate cannot be barred by a state statute which cuts off the filing of claims a certain period after commencement of *state* probate proceedings. The Supreme Court reasoned that the deprivation of a claim because of the working of such a statute would constitute "significant state action":

The probate court is intimately involved throughout, and without that involvement the bar is never activated. The nonclaim statute becomes operative only after probate proceedings have been commenced in state court.

485 U.S. at 487, 108 S.Ct. at 1346. The *Pope* Court contrasted this sort of statute with a "self-executing" statute of limitations, which begins to run *not* from the date of institution of probate proceedings in state court but from

---

**3.** Many portions of the Maryland probate statutes, like those of other states, appear to be based on the Uniform Probate Code. Section 3–804 of the Uniform Probate Code provides that a creditor may file a "written statement" of his claim with the personal representative; it does not provide for a "verified" statement. *Compare* Unif.Probate Code § 3–804 (1987) *with* Md.Code (1974, 1991 Repl.Vol., 1992 Cum. Supp.) § 8–103 of the Est. & Trusts Article.

the date of death. The Court found that such a self-executing statute of limitations did not violate the Due Process Clause because:

The State's interest in a self-executing statute of limitations is in providing repose for potential defendants and in avoiding stale claims. The State has no role to play beyond enactment of the limitations period. While this enactment obviously is state action, the *State's limited involvement* in the running of the time period generally *falls short of constituting the type of state action required to implicate protection of the Due Process Clause.*

485 U.S. at 486–487, 108 S.Ct. at 1346. (emphasis added)

Prior to *Pope*, § 8–103, like the statute at issue in *Pope*, did not qualify as a self-executing statute of limitations; rather it provided only that creditors must submit claims within "six months" after the first appointment of a personal representative." § 8–103(a) (1974). In 1989, however, the General Assembly enacted Chapter 496 of the Laws of 1988 to amend § 8–103 to conform with the standards of statutory self-execution enunciated in *Pope*. *See* Floor Report, House Bill 3, Senate Judicial Comm. (1989). Hence, § 8–103 now does contain a self-executing statute of limitations, *i.e.*, "all claims against an estate ... are forever barred ... unless presented within the earlier of the following dates (1) Six [4] months after the date of decedent's death; or (2) Two months after the personal representative delivers to the creditor a copy of a notice [of the decedent's death]." § 8–103(a). A self-executing statute of limitations, like § 8–103(a), does not violate a creditor's due process rights. *See Pope, supra,* 485 U.S. at 486, 108 S.Ct. at 1345 ("due process does not require that potential plaintiffs be given notice of the impending expiration of a period of limita-

---

**4.** During the period applicable to this law suit, claims had to be filed nine rather than six months after decedent's death. *See supra* n. 2. Since 1989, however, the limitations period has always been self-executing.

tions"). *See also, Texaco, Inc. v. Short,* 454 U.S. 516, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982); *Ohio Casualty Ins. Co. v. Hallowell,* 94 Md.App. 444, 617 A.2d 1134 (1992).[5]

(iv)

■ Lampton next asserts that LaHood is estopped from relying on the time limitations in § 8–103 because LaHood did not comply with his own statutory obligations, as personal representative. Specifically, Lampton asserts that, in failing to notify her, a known creditor of the Estate, of the time limitations in § 8–103, LaHood violated § 7–103.1(a), which provides:

In general—Promptly after appointment, the personal representative of a decedent's estate shall

(1) Make a reasonably diligent effort to ascertain the names and addresses of the decedent's creditors; and

(2) Mail or otherwise deliver a notice to those creditors whose names and addresses he has ascertained of the time within which their claims may be presented under § 8–103(a) of this article.

Lampton is quite right that § 7–103.1(a) does impose a statutory obligation on the personal representative (he "shall" notify "ascertained" creditors of the "time" within which their claims may be presented under § 8–103(a)), an obligation with which LaHood concedes he did not comply. What Lampton ignores is the fact that § 7–103.1(c)(1) specifically provides:

The failure of a creditor to receive notice under this section shall not extend the time within which the creditor may present his claim beyond six months from the date of the decedent's death.

Thus, the General Assembly has expressly stated that a personal representative's failure to notify a creditor does

---

5. Lampton raises no claim that the statutory period set forth in § 8–103, even if deemed to be a self-executing statute of limitations, is too short to afford due process. *See Pope, supra,* 485 U.S. at 494, 108 S.Ct. at 1349–50 (Rehnquist, C.J., dissenting).

not provide a creditor with any basis for extending the time in which he or she may present a claim. Hence, LaHood's failure to provide Lampton notice of the requirements of § 8–103(a) did violate § 7–103.1(a), but that failure does not extend Lampton's time to present a claim.

(v)

■ Lampton makes an additional estoppel argument that is not so easily resolved. She asserts that LaHood, "repeatedly by his assertions, correspondence and actions throughout all of the pertinent time periods surrounding the administration of this Estate," caused her, "through her attorney and agent, DuRant, to justifiably forebear the filing of any 'formal' claim" until after the filing deadline had expired.

■ In *Chandlee v. Shockley*, 219 Md. 493, 502, 150 A.2d 438 (1958), the Court of Appeals expressly held "an executor or administrator against whom a claim is asserted by virtue of [the statutory predecessor of § 8–103] may" by his conduct "waive or be estopped to rely on the time limit of the statute." As the *Chandlee* Court noted, there is some authority to the contrary. *See Chandlee*, 219 Md. at 498–501, 150 A.2d 438. This principle is, however, "well settled" in Maryland. *See Nyitrai v. Bonis*, 266 Md. 295, 299, 292 A.2d 642 (1972); *Hallowell, supra* and numerous cases cited and discussed therein.[6] Moreover, it is now well established that "an estoppel may arise even where there is no intent to mislead, if the actions of one party cause a prejudicial change in the conduct of the other." *Knill v.*

---

**6.** Even before *Chandlee*, the Court of Appeals had held that although an executor had rejected a creditor's claim and the creditor failed to bring an action within the specified time of that rejection, the claim was not barred because the executor subsequently admitted to the claimant the obligation of the estate to pay the claim. *Bogart v. Willis*, 158 Md. 393, 407, 148 A. 585 (1930). The *Bogart* Court explained, "[a]ny other construction would permit a defendant to play fast and loose, and claim the benefits of the statute while at the same time leading the plaintiff to believe that he proposed to pay the claim." 158 Md. at 407, 148 A. 585.

*Knill,* 306 Md. 527, 534, 510 A.2d 546 (1986). Indeed, all that is needed to create an equitable estoppel is (1) voluntary conduct or representation, (2) reliance, and (3) detriment. *Id.* at 535, 510 A.2d 546. All three elements are alleged here; indeed, Lampton introduced evidence of all three. Furthermore, LaHood concedes the first element, his representation, and the third, Lampton's detriment.

LaHood's sole argument is that Lampton's reliance upon his representation was unreasonable or "not justified." [7] We note at the outset that LaHood's own testimony and conduct make it exceedingly difficult for him to maintain that Lampton or DuRant was unreasonable in believing, on the basis of LaHood's representation, that anything more had to be done to perfect Lampton's claim against the Estate. That is, LaHood conceded not only that he indicated this to DuRant in August, 1989, but also that throughout 1989, 1990, and the first part of 1991, he, LaHood, believed this and for this reason thought the Estate and Mr. Hackett would be responsible for any deficiency on the Note to Lampton. In September, 1990, LaHood so stated in a letter to the trustee of decedent's children, and in January, 1991, LaHood filed a non-resident South Carolina estate tax return listing the mortgage on the condominium as an obligation of Mr. Hackett and the Estate. *Compare Stone v. Stone,* 230 Md. 248, 253, 186 A.2d 590 (1962) (generally party will not be permitted to take inconsistent positions where he has full knowledge of the facts and another will be prejudiced by his action).

---

7. Generally, Maryland cases do not seem to contain language requiring that estoppel be based upon "justifiable" or "reasonable" reliance. *But see, Chesapeake Homes, Inc. v. McGrath,* 249 Md. 480, 240 A.2d 245 (1968) ("reasonable diligence" required). Maryland courts have, however, long relied on Pomeroy's definition of equitable estoppel, which requires *inter alia* "good faith" reliance. *See e.g., Knill,* 306 Md. at 534, 510 A.2d 546, *quoting* 3 J. Pomeroy, *Equity Jurisprudence,* § 804 (5th ed. 1941). Presumably, reliance that was unjustified or unreasonable would not be in "good faith." In any event, Lampton's counsel expressly conceded at oral argument that reliance had to be justified or reasonable in order to form the basis for estoppel.

LaHood cites no legal authority in support of his argument that Lampton's reliance was not justified; his entire explication of this argument is:

There is no dispute that in the telephone conversation of August, 1989, the personal representative's main concern was the equity in the condominium, and whether Mr. DuRant would represent the estate in an ancillary administration. There is no evidence that the personal representative ever spoke directly to the Appellant. The Appellant is now relying on a conversation between the personal representative and Mr. DuRant to say that she reasonably relied upon statements made by the personal representative in not filing a claim. The upshot of the conversation in August of 1989 is that Mr. DuRant set up an attorney-client relationship between himself and the estate of Terri Hackett. This relationship was confirmed by the letter from Mr. LaHood to Mr. DuRant dated August 17, 1989, the letter from Mr. DuRant's associate to the personal representative dated August 29, 1989, the letter from the personal representative to Mr. DuRant dated October 2, 1989, and the letter from Mr. DuRant to the personal representative dated November 1, 1989.

The Appellant was not justified in relying on that conversation as an excuse for not filing a claim within the nine-month time period.

(citations to Record Extract omitted). There is no inaccuracy in LaHood's statement of the above facts, but how these facts support a finding that Lampton's reliance was "not justified" is unclear. Nor did LaHood in any way clarify this point at oral argument.

It seems to us that the only way that these facts could legitimately lead to a finding that Lampton's reliance was unjustified was if DuRant, at the time of LaHood's representation to him, was not acting as Lampton's attorney or

agent.[8] This is so because if at the time of the representation, LaHood knew that DuRant was acting as Lampton's representative then he had fiduciary obligations to DuRant and Lampton. *See* § 7–101(a); *Sullivan v. Doyle,* 193 Md. 421, 431, 67 A.2d 246 (1949) ("an administrator is considered to be a trustee for the creditors and next of kin of the deceased"); *Bastian v. Laffin,* 54 Md.App. 703, 708, 460 A.2d 623 (1983). Thus, the critical question is: was there any evidence in the record to support the conclusion that DuRant was not acting as Lampton's representative at the time of the fateful telephone call. We have combed the record and can find no support for this conclusion.[9] Indeed, there is uncontroverted evidence that DuRant was acting as Lampton's attorney and agent during the telephone conversation and that LaHood knew that DuRant was so acting.

Thus, DuRant expressly testified that, at the time of the August, 1989 telephone conversation with LaHood, he was Lampton's lawyer. He testified that Lampton owned a "substantial number of condominiums which were sold with seller financing," that he had handled the sales and mortgage payments on all of the condominiums, and had written numerous letters to the decedent and her husband because of delinquency in their payments. Indeed, DuRant testified that since he handled "all of Ms. Lampton's personal affairs" in the area through a "durable power of attorney" his "involvement" was "a little more sometimes probably than an attorney. I'm actually acting in her behalf in all of

---

8. Although LaHood does not make this express claim, that seems to be the inference he wants us to make. For example, the question presented and argument heading on this point is:
 Was the claimant in this case [Lampton] justified in relying on statements made by the personal representative [LaHood] in a conversation between claimant's *alleged* attorney/agent [DuRant] and the personal representative when the conversation concerned the representation of the estate by the claimant's *alleged* agent/attorney in an ancillary estate?
 (emphasis added.)

9. This may be why LaHood never explicitly asserts that DuRant was not representing Lampton at the time of the August telephone call.

these transactions." DuRant further testified that he asked LaHood what "I needed to do *to protect Ms. Lampton's* interest in the estate filing in Maryland ... The question was, was it necessary ... for me to file a claim to protect *my client's* interests under her note and mortgage." (emphasis added). Finally, DuRant testified that LaHood telephoned him precisely because LaHood knew that he was Lampton's representative, *i.e.*, "because my name was all over the documents that Mrs. Hackett [the decedent] would have had."

LaHood did *not* contradict *any* of this testimony. Indeed, although he remembered "little" of the telephone conservation, he conceded that (1) he did initiate the telephone conversation with DuRant because DuRant's name, as Lampton's attorney, was on the settlement documents for the condominium, (2) he and DuRant discussed what DuRant would have to do to preserve *Lampton's* claim against the Estate and (3) he agreed with DuRant that DuRant need not file a claim *for Lampton.* Nor does DuRant's agreement to act for the decedent in instituting ancillary estate administration in South Carolina in any way indicate, as LaHood seems to suggest, that, in doing so DuRant ceased to represent Lampton. As long as Lampton's claim would be honored by the Estate, there was nothing to prevent DuRant from doing both. *See* Maryland Rules of Professional Conduct 1.7 (1987). The fact that DuRant withdrew from representation of the Estate,´ as soon as he learned of a "potential conflict" because the Hackett family "could not get together" with him as to settlement of Lampton's claim, does not in any way support the conclusion that prior to that time he did not represent Lampton. Rather such withdrawal was necessary *only* because DuRant did represent Lampton.

■ Thus, the uncontroverted facts with regard to reliance are: (1) DuRant, acting as Lampton's representative, asked LaHood what was necessary "to protect Ms. Lampton's interests in the [Hackett] estate.... specifically was there a necessity ... [to] file any claim with the Maryland

courts ... to protect my client's [Lampton's] interests under her note and mortgage and (2) LaHood, owing a fiduciary obligation to Lampton because she was an Estate creditor, responded that a filing was "not necessary ... because he was aware of the claim.... [a]nd it would be paid" and (3) LaHood never corrected this misrepresentation. It well may be that "sound business judgment and discretion" should have influenced Lampton and/or DuRant to explore further the requirements of Maryland law; these factors do not, however, relieve LaHood, as the Estate's administrator, of his fiduciary obligations to the Estate's creditors. *See Hartford Accident & Indemnity Co. v. Aiello,* 497 F.2d 257, 261 (4th Cir.1974) (applying Maryland law). Although the "laxity" of Lampton and/or DuRant might leave them "remediless in an arm's length transaction," it does not relieve LaHood of his fiduciary responsibilities. *Id.* A fiduciary, of course, has a duty "of utmost good faith and loyalty and the obligation ... to make full disclosure of all known information that is significant, and material...." *Impala Platinum v. Impala Sales,* 283 Md. 296, 324, 389 A.2d 887 (1978) (quoting *Herring v. Offutt,* 266 Md. 593, 597 (1972)). *Accord Allen v. Steinberg,* 244 Md. 119, 128, 223 A.2d 240 (1966). *See also Harrison v. McCarty,* 178 Md. 377, 381, 13 A.2d 544 (1940) (held that even in a non-fiduciary relationship an employee acted reasonably in relying on far less explicit conduct by an employer and so the employer was estopped from raising limitations as a defense to a workers' compensation claim, which the employee failed to file within the limitations period).

In sum, here as in *Aiello,* the personal representative owed a fiduciary duty to the creditors of the decedent. Again as in *Aiello,* the reliance of the creditor, here Lampton, on the Estate's representative, was "justifiable and inherent in the relationship of the parties." *Id.* at 261. Thus, as in *Aiello,* we must reverse the lower court and remand so that the creditor's claim can be reinstated. *Id.* at 262.

Remand is complicated here by the fact that the record is unclear as to certain critical matters. First, the precise amount due Lampton on this claim is unclear. In her claim and petition for allowance of claim, Lampton asserts a right to "$90,831.97 together with interest at the rate of 14% from January 17, 1991 until paid." This is apparently the amount of the January 17, 1991, South Carolina judgment and includes principal, interest, late charges and attorney fees as of that date. At the hearing before the Orphans' Court, however, DuRant testified that the South Carolina property "had been sold at auction" for $55,050 "leaving roughly a deficiency of $35,000 plus interest." Therefore, at the very least, the Estate would seem to be entitled to a "credit" on the amount due Lampton, in the amount the condominium brought at auction. On remand the Orphans' Court must determine the proper amount due Lampton on her claim.

The record also does not reveal precisely what Estate assets are available to satisfy Lampton's claim. The most recent administration account in the record was approved in March, 1991, and indicates that at that time the Estate had paid numerous creditors' claims and had remaining assets of only approximately $7,500. It is well established that the executor or administrator may bring an action to recover overpayments made to creditors under the honest belief that the estate was solvent. *See Chestertown Bank of Maryland v. Perkins*, 154 Md. 456, 140 A. 834 (1928).[10] Accordingly, on remand the Orphans' Court must determine the precise amount due Lampton on her claim and, if there are not sufficient assets remaining in the Estate to pay this claim, direct the Personal Representative to marshall the assets of the Estate in every appropriate manner so that all creditors, including Lampton, can be paid fully or on an equal *pro rata* basis.

---

**10.** Here LaHood's appellate brief indicates that he has already instituted such an action.

(vi)

Lampton's final claim is that LaHood is "personally accountable" to her for "his failure to properly administer the estate." Section 8–109 of the Estate & Trust Art. provides that a personal representative may be individually liable to third parties for damages arising from administration of the estate and further provides:

The individual liability of the personal representative to third parties arising from the administration of the estate may be determined in the same proceeding in which a claim by the third party against the estate is considered.

§ 8–109(e). Such a claim must be filed within six months from the date on which it arose. § 8–103(c). There is no assertion that this claim was not timely or properly filed.

Lampton relies upon two statutes, Est. & Trusts Art. §§ 7–101(a) and 8–109(a), as establishing LaHood's personal liability to her. Section 7–101(a) provides that a personal representative is a "fiduciary" with a "general duty *to settle and distribute the estate*" in accordance with the "estates of decedents law," who is to use the "authority conferred upon him" by that law and "by the equitable principles generally applicable to fiduciaries, fairly considering the interests of all interested persons and *creditors.*" (emphasis added). As discussed above, this provision and its statutory predecessor have been recognized as imposing a fiduciary duty on the personal representative in administering the estate for the benefit of not only heirs, but also creditors. *See, e.g., Aiello, supra,* 497 F.2d at 261; *Bastian v. Laffin, supra,* 54 Md.App. at 703, 460 A.2d 623. Section 7–101(a) does not, however, impose any liability on a personal representative for acts done in his individual, rather than representative, capacity.

 Section 8–109(a) governs a personal representative's liability to creditors of the estate for acts done in his individual capacity. It provides:

The individual liability of a personal representative to third parties arising from the administration of the estate

*is that of an agent for a disclosed principal,* as distinguished from his fiduciary accountability to the estate. (emphasis added). An agent for a disclosed principal generally has no special duty to third persons, by reason of his agency relationship, and so is only liable to third persons for his own misconduct. Furthermore, § 8–109(b) and (c) make it clear that a personal representative's contractual and tort liability to third persons is severely limited. These sub-sections provide

(b) Contracts made during administration.—A personal representative is not individually liable on contracts properly entered into in his fiduciary capacity in the course of administration of the estate unless he expressly agrees to be.

(c) Obligations and torts.—A personal representative is not individually liable for obligations arising from possession or control of property of the estate or for torts committed in the course of administration of the estate unless he is personally at fault.

■ In her Petition for Allowance of Claim, Lampton asserted *inter alia* that she suffered "severe financial damages as a direct result of ... the misrepresentations and continued statements and assurances and other conduct of LaHood, the Personal Representative, with regard to the Deceased's debt to the Petitioner." In support of this claim, DuRant testified that LaHood's misrepresentation was unequivocal and Lampton introduced numerous exhibits indicating that for two years LaHood had taken the position that the Estate was liable to Lampton for any deficiency; this evidence arguably established that LaHood's misrepresentation was intentional or reckless and thus that LaHood was personally at fault and personally liable to Lampton. On the other hand, at the hearing in the Orphans' Court, LaHood stated that his misrepresentation was minimal and unintentional, that he forgot he had made it and did not intend to mislead DuRant or injure Lampton; this testimony would seem to be sufficient evidence, if believed, to defeat a claim of individual liability. We would

ordinarily defer to the finder of fact and affirm. We do not do so here because of certain peculiarities of this case.

First, although Lampton specifically requested in her petition not only that her claim be "allowed in full," but also that LaHood be ordered to account to her personally for his "failure to properly administer said estate," the Orphans' Court simply ordered that "the Petition for Allowance of Claim is hereby denied." That order, of course, does not directly address Lampton's request that LaHood be "ordered to personally account" to her.[11] Moreover, there was no oral argument on the issue of LaHood's personal liability. Thus, we are left with the strong impression that the Orphans' Court may not have focused on this issue.

■ Furthermore and perhaps more significantly, LaHood, a member of the Maryland Bar, acted as the attorney for himself in both his representative capacity, as personal representative of the Estate, and in his personal capacity. Certainly, one is entitled to represent oneself—although the old adage suggests this may not be wise. Moreover, in many cases, it may be entirely appropriate for a lawyer, serving as personal representative, to act for the estate by representing himself in his representative capacity. Here, however, Lampton claimed against the Estate, through LaHood, the personal representative, *and* against LaHood individually. Moreover, LaHood was the critical—indeed the only—witness for the Estate and on his own personal behalf. In these circumstances, LaHood should not have acted as attorney for himself in both capacities. There was and is an inevitable and irreconcilable conflict of interest. Although both the Estate and LaHood seek to escape all liability, that, as indicated in part (v) within, is not possible. Thus, it is in the Estate's best interest to prove that liability

---

11. We believe that the order was nonetheless a final judgment since for better or worse it did adjudicate the entire claim and the rights and liabilities of all parties. No party has argued to the contrary. If this order was not final, we would exercise our discretion pursuant to Rule 8-602(e)(1)(C) and enter a final judgment.

is LaHood's alone and it is in LaHood's best interest to prove that liability is that of the Estate.

This conflict was not recognized below by the court or any party; LaHood was permitted to represent himself personally and the Estate, and to argue and to testify. We cannot determine, on review of the cold record, what effect this had on the determination of LaHood's individual liability by the Orphans' Court. It may not in any way have affected the court's determination. As a matter of law, we have held that the Orphans' Court was correct in rejecting Lampton's first three arguments and erroneous in rejecting her fourth argument. Her final claim as to LaHood's individual liability, however, is one on which the record is scant and the facts in dispute. Thus, we must remand this issue to the orphans' court so that it can hold a new evidentiary hearing to determine if LaHood is individually liable to Lampton. At that hearing, the Estate and La-Hood, individually, should be represented by separate counsel.

### (vii)

In summary, on remand the Orphans' Court is to

(a) determine the amount of Lampton's claim against the Estate;

(b) reinstate Lampton's claim against the Estate in that amount;

(c) direct the Personal Representative to take all steps necessary to marshall the assets of the Estate, so that the claims of all creditors including Lampton, can be paid fully or on an equal *pro rata* basis; and

(d) hold an evidentiary hearing to determine if LaHood is personally liable to Lampton and, if so, in what amount.

JUDGMENT REVERSED AND CASE REMANDED TO THE ORPHANS' COURT FOR CHARLES COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

**486**

COSTS TO BE PAID ONE HALF BY APPELLANT
AND ONE HALF BY APPELLEE.